341 F.3d 961
 CITIZENS FOR BETTER FORESTRY; The Ecology Center; Gifford Pinchot Task Force; Kettle Range Conservation Group; Idaho Sporting Congress, Inc.; Friends Of The Clearwater; Utah Environmental Congress; Cascadia Wildlands Project; Klamath Siskiyou Wildlands Center; Southern Appalachian Biodiversity Project; Headwaters; The Lands Council, Plaintiffs-Appellants,
v.
U.S. DEPARTMENT OF AGRICULTURE; United States Forest Service, Defendants-Appellees.
 No. 02-16009.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 10, 2003 — San Francisco, California.
 Filed August 28, 2003.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Michael Axline and Marc D. Fink, Western Environmental Law Center, Eugene, Oregon, and Roger Beers, Oakland, California for the plaintiffs-appellants.
 Thomas L. Sansonetti, Assistant Attorney General, David C. Shilton and Sylvia Quast, United States Department of Justice, Washington, D.C. for the defendants-appellees.
 Appeal from the United States District Court for the Northern District of California; Martin J. Jenkins, District Judge, Presiding. D.C. No. CV-01-00728-MJJ.
 Before: John T. Noonan, A. Wallace Tashima, and Kim McLane Wardlaw, Circuit Judges.
 OPINION
 WARDLAW, Circuit Judge:
 
 
 1
 Appellants[1] (hereinafter "Citizens"), a coalition of environmental groups, appeal the district court's grant of partial summary judgment in favor of the United States Department of Agriculture and the United States Forest Service (collectively the "USDA"). Asserting that the USDA failed to comply with procedural requirements of the National Environmental Policy Act and the Endangered Species Act before promulgating its new national forest management policy (the "2000 Plan Development Rule"), Citizens sought injunctive relief to preclude implementation of the 2000 Plan Development Rule until the USDA complied with the statutory requirements. The district court held it did not have jurisdiction over this action because (i) Citizens failed to demonstrate a reasonable probability that the Rule threatened their concrete interests as their complaint was directed to neither a site-specific project nor a particular forest plan, and thus they lack standing; and (ii) Citizens failed to show any imminent injury and thus their claims are not ripe. Because Citizens alleges procedural injury, however, we hold that Citizens established both standing and ripeness, and reverse and remand to the district court to determine whether injunctive relief is appropriate.
 
 I. Background
 A. Historical Overview
 
 2
 National forests and grasslands are managed by the United States Forest Service, an agency within the United States Department of Agriculture. This agency utilizes a three-tiered approach to forest management, prescribed by the Forest And Rangeland Renewable Resources Planning Act of 1974 and the National Forest Management Act of 1976 ("NFMA") (both statutes codified as amended at 16 U.S.C. §§ 1601-1687).
 
 
 3
 National uniform regulations promulgated by the Secretary of Agriculture constitute the highest tier of regulatory oversight of the forest management system and govern the development and revision of the regional and local plans. 16 U.S.C. § 1604(g). These regulations mandate the compliance of lower-level plans with the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321-4370f ("NEPA"), specifically setting forth the circumstances that require preparation of an Environmental Impact Statement ("EIS"). 16 U.S.C. § 1604(g)(1). In addition, they set broad guidelines (to be followed when preparing regional and site-specific plans) regarding plant and animal species conservation, timber management, and water management. Id. § 1604(g)(3). It is this highest-tier type of regulation (hereinafter referred to as a "plan development rule") that is at issue.
 
 
 4
 The next tier of regulatory oversight comprises regional "land and resource management plans" ("LRMPs") for large "units" in the national forest and grassland system. 16 U.S.C. § 1604(a). These plans operate like zoning ordinances, defining broadly the uses allowed in various forest regions, setting goals and limits on various uses (from logging to road construction), but do not directly compel specific actions, such as cutting of trees in a particular area or construction of a specific road. See Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 729, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998). The content and promulgation of these plans must comply with the plan development rule.
 
 
 5
 At the lowest tier of forest rules are the so-called "site-specific" plans, which are prepared to effect specific, on-the-ground actions; these plans must be consistent with both sets of higher-level rules. 16 U.S.C. § 1604(i).
 
 
 6
 The USDA promulgated the first national forest-management plan development rule in 1979, accompanied by a full EIS analyzing the environmental impact of the regulation. See National Forest System Land and Resource Management Planning, 44 Fed.Reg. 53,928 (Forest Serv., Dep't of Agric. Sept. 17, 1979) (creating 36 C.F.R. pt. 219) ("1979 Plan Development Rule"). This rule was short-lived, and was substantially revised in 1982. See National Forest System Land and Resource Management Planning, 47 Fed.Reg. 43,026 (Forest Serv., Dep't of Agric. Sept. 30, 1982) (amending 36 C.F.R. pt. 219) ("1982 Plan Development Rule"). When initially published in the Federal Register as a draft rule, the 1982 Plan Development Rule was accompanied by a brief Environmental Assessment ("EA"), but not a full EIS.[2] See 47 Fed.Reg. 7678, app. A at 7694 (Feb. 22.1982).
 
 
 7
 The 1982 Plan Development Rule set out a comprehensive approach to forest management, implementing the statutory directive. See 47 Fed.Reg. at 43,038 (revising 36 C.F.R. § 219.1(a)). This Rule required that "[f]ish and wildlife habitat shall be managed to maintain viable populations [thereof]," further defining a "viable" population as "one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the [relevant] area." See id. at 43,048 (creating 36 C.F.R. § 219.19) (emphasis added). In addition, the 1982 Rule required the development of so-called "regional guides," which "provide[d] standards and guidelines for addressing major issues and management concerns which need to be considered at the regional level to facilitate forest planning." See id. at 43,042 (revising 36 C.F.R. § 219.8-.9). Furthermore, the Rule contained "minimum specific management requirements," setting forth mandatory directives which all regional LRMPs must follow, and specific, quantifiable baselines below which no LRMP or site-specific plan can fall. See id. at 43,050 (creating 36 C.F.R. § 219.27). These requirements included, inter alia, establishment of 100-foot buffers around bodies of water and specific limits on tree-cutting. See id.
 
 
 8
 Although not put in place through the same rulemaking notice as the 1982 Rule, procedures for the public to appeal certain decisions relating to LRMPs existed prior to the 2000 Rule. These procedures were modified several times between the early 1980s and the later 2000 Rule. See 36 C.F.R. pt. 217 (1999) (previous codification at 36 C.F.R. § 211.18 (1988)). The pre 2000 appeal rule permitted members of the public to file a notice of appeal "within 90 days of the date specified in the published legal notice for land and resource management plan approvals, significant amendments, or revisions," id. § 217.8(a)(3), i.e., within 90 days after a final decision is made.
 
 B. The 2000 Plan Development Rule
 
 9
 The 1982 Rule was the subject of the USDA's unsuccessful six-year effort at amendment, culminating in 1995 with a draft rule that was never finalized. Subsequently, the Secretary of Agriculture convened a 13-member scientist committee under 16 U.S.C. § 1604(h), to offer recommendations for revising the plan development rules. After conducting a number of public meetings and conferences, the USDA published a proposed rule in late 1999, soliciting further public comment. See 64 Fed.Reg. 54,074 (Oct. 5, 1999). The public comment period ran from October 5, 1999, through February 10, 2000. See 65 Fed.Reg. 67,514, 67,517 (Nov. 9, 2000).
 
 
 10
 Unlike the previous draft plan development rules, the proposed rule did not include any analysis of its environmental impact and did not specifically solicit comments on this matter. The USDA did, however, state that it would complete an "environmental review" at some point before the adoption of a final rule. 64 Fed. Reg. at 54,094. It claims that it complied with this promise, preparing an Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") dated July 21, 2000 (over five months after the close of the comment period for the proposed rule), although these documents were never published in the Federal Register. (They were, however, apparently available on the Forest Service's website.) The USDA never completed any "biological assessment" of the rule's impact on endangered species under the Endangered Species Act ("ESA"); nor did it engage in formal consultation with the Secretaries of the Interior or Commerce.[3]
 
 
 11
 The final version of the 2000 Plan Development Rule was published on November 9, 2000. National Forest System Land and Resource Management Planning, 65 Fed.Reg. 67,514 (Forest Serv., Dep't of Agric. Nov. 9.2000). The published version was not accompanied by any environmental or endangered-species analysis, although it did note the existence of the EA and FONSI, thus the USDA did not entertain comments regarding the rule's environmental impact. Id. at 67,567.
 
 
 12
 This Rule substantially modified the 1982 Rule in a number of ways. First, it relaxed the species "viability" requirement by providing that "[p]lan decisions affecting species diversity must provide for ecological conditions that ... provide a high likelihood that those conditions are capable of supporting over time the viability of... species well distributed throughout their ranges within the plan area." Id. at 67,575 (amending 36 C.F.R. § 219.20(b)(2)) (emphasis added). The 1982 Rule had more stringently required that the USDA "insure" continued species existence. 47 Fed.Reg. at 43,038. The 2000 Rule also eliminated the requirement of developing and issuing "regional guides" to maintain regional consistency in forest management. See 65 Fed.Reg. at 67,527. It further eliminated many of the "minimum specific management requirements." For example, in comments submitted in response to the draft 2000 Rule, the Environmental Protection Agency ("EPA") observed that "while [the 1982 Rule] contain[s] specific limits on clear cutting [of trees], the proposed [2000 Rule] would require only that individual forest plans `provide standards and guidelines for timber harvest and regeneration methods,'" and asked "[h]ow will the proposed [2000 Rule] ensure requirements necessary for sustainability?"
 
 
 13
 Finally, the 2000 Plan Development Rule eliminated the post-decision appeal process of 36 C.F.R. pt. 217, and replaced it with a pre-decision "objection" process. 65 Fed.Reg. at 67,568 (removing 36 C.F.R. pt. 217); id. at 67,578 79 (creating 36 C.F.R. § 219.32). Under this new process, members of the public wishing to object to an amendment or revision of an LRMP have 30 days from the date an EIS is made available to do so. See id. Thus, this process can occur before the finalization of the planned amendment if the EIS is published more than 30 days before the amended LRMP becomes final.
 
 
 14
 The 2000 Rule contained a transitional provision designed to facilitate the move from the requirements of the 1982 Rule: USDA officials were permitted to comply with either the 1982 Rule or the 2000 Rule for plans that were under revision at the time and for which final or draft EISs would be completed by May 9, 2001. See id. at 67,579 (creating 36 C.F.R. § 219.35(b)). A technical amendment issued a few weeks later, clarifying that the choice to comply with either rule included the choice to comply with either the old appeal rules or the new objection process. 66 Fed.Reg. 1864, 1865-66 (Jan. 10, 2001) (creating 36 C.F.R. § 219.35(b) app. A).
 
 C. District Court Proceedings
 
 15
 Citizens filed suit in the Northern District of California on February 16, 2001, challenging both the substance of the 2000 Rule under NFMA, as well as procedural violations of NEPA and the ESA in its promulgation.
 
 
 16
 Shortly thereafter, USDA announced that it was considering revising the Rule, noting "serious concerns [that] have arisen regarding some of the provisions of the [2000 Rule]," including specifically the revised Rule's impact on "ecological sustainability and species viability." See 66 Fed. Reg. 27,552 (May 17, 2001). The USDA's announcement noted the existence of this lawsuit as one of the reasons behind its decision. Id. The announcement also modified the 2000 Rule's transitional provision, extending until May 9, 2002, the period within which USDA officials could choose to follow either the 1982 Rule or the 2000 Rule. See id. at 27,554 (amending 36 C.F.R. § 219.35(b)).
 
 
 17
 Soon thereafter, USDA definitively announced that it was developing a new rule to replace the 2000 Plan Development Rule, planning to have it in place before the expiration of the revised transitional provision in mid-2002. See 66 Fed.Reg. 61,400 (Dec. 3, 2001). When it became clear that the USDA could not meet this timetable, it again amended the transitional provision to allow USDA officials to choose between the 1982 and 2000 Rules "[u]ntil the Department [of Agriculture] promulgates the revised final planning regulations announced [on] December 3, 2001." 67 Fed.Reg. 35,431, 35,434 (May 20, 2002) (amending 36 C.F.R. § 219.35(b)).
 
 
 18
 Citizens and the USDA thereafter stipulated to stay the portion of this action challenging the merits of the 2000 Rule pending the Rule's revision. The parties did not agree to stay the procedural challenge to the 2000 Rule. Citizens moved for partial summary judgment on its procedural claims, seeking to enjoin any further implementation of the 2000 Rule until the procedural violations had been cured. The USDA filed a cross-motion for summary judgment, asserting that Citizens lacked standing to challenge the 2000 Rule and that its claims were not ripe for review.
 
 
 19
 On February 20, 2002 the district court granted the USDA's motion for partial summary judgment and denied Citizens' motion for partial summary judgment, holding that the suit was not justiciable for lack of standing and ripeness. Upon Citizens' filing of motions for reconsideration and clarification, the district court reaffirmed its order, making clear that its ruling also constituted a denial of Citizens' request for injunctive relief.
 
 II. Standard of Review
 
 20
 We review a district court's grant of summary judgment de novo. Oliver v. Keller, 289 F.3d 623, 626 (9th Cir.2002). In doing so, we use the same standard used by the trial court under Federal Rule of Civil Procedure 56(c) — whether, viewing the evidence in the light most favorable to the nonmoving party, there are any questions of material fact and whether the district court correctly applied the substantive law. Id. Standing and ripeness are questions of law we review de novo. Bernhardt v. County of Los Angeles, 279 F.3d 862, 867 (9th Cir.2002) (standing); Kern v. United States Bureau of Land Mgmt., 284 F.3d 1062, 1070 (9th Cir.2002) (ripeness).
 
 III. Standing
 
 21
 "To satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an `injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).
 
 A. Injury in Fact
 
 22
 "`To satisfy the injury in fact requirement, a plaintiff asserting a procedural injury must show that the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing.'" Public Citizen v. Dep't of Transp., 316 F.3d 1002, 1015 (9th Cir.2003) (quoting Cantrell v. City of Long Beach, 241 F.3d 674, 679 (9th Cir.2001)). Furthermore, he or she "need[s] [to] establish `the reasonable probability of the challenged action's threat to [his or her] concrete interest.'" Hall v. Norton, 266 F.3d 969, 977 (9th Cir.2001) (quoting Churchill County v. Babbitt, 150 F.3d 1072, 1078 (9th Cir.1998)). Thus, to show a cognizable injury in fact, Citizens must allege (and on summary judgment adduce sufficient facts to show) that (1) the USDA violated certain procedural rules; (2) these rules protect Citizens' concrete interests; and (3) it is reasonably probable that the challenged action will threaten their concrete interests.
 
 1. Procedural Violation
 
 23
 Citizens were deprived of the opportunity to comment on the USDA's EA and FONSI at all points in the rulemaking process. This deprivation violated their rights under the regulations implementing NEPA. See 40 C.F.R. § 1501.4(b) ("The agency shall involve the public, to the extent practicable, in preparing [EAs]...."); id. § 1506.6 ("Agencies shall... [m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures[,] ... [p]rovide public notice of ... the availability of environmental documents so as to inform those persons ... who may be interested or affected[,] [and] ... [s]olicit appropriate information from the public."). But cf. Pogliani v. United States Army Corps of Eng'rs, 306 F.3d 1235, 1238-39 (2d Cir.2002) (per curiam) (holding that environmental plaintiffs have no right to see and comment on EAs/FONSIs before they issue, unless 40 C.F.R. § 1501.4(e) applies).
 
 
 24
 We reject the USDA's dismissal of these regulatory requirements as "hortatory." Although it is true that "[a]n EA need not conform to all the requirements of an EIS," S. Or. Citizens Against Toxic Sprays, Inc. v. Clark, 720 F.2d 1475, 1480 (9th Cir.1983), this requirement does not mean that 40 C.F.R. §§ 1501.4(b) and 1506.6 are without substance. We have previously interpreted these regulations to mean that "[t]he public must be given an opportunity to comment on draft EAs and EISs." Anderson v. Evans, 314 F.3d 1006, 1016 (9th Cir.2002). The Second Circuit has held that § 1501.4 is satisfied when the agency "conducted public hearings and received written comments on every draft environmental assessment [and] circulated for comment its Preliminary Analysis of the environmental assessment," even though it did not circulate for public comment a follow-up independent analysis it prepared in response to public comments. Town of Rye v. Skinner, 907 F.2d 23, 24 (2d Cir.1990) (per curiam); see also Hanly v. Kleindienst, 471 F.2d 823, 836 (2d Cir.1972) ("[B]efore a preliminary or threshold determination of significance is made the responsible agency must give notice to the public of the proposed major federal action and an opportunity to submit relevant facts which might bear upon the agency's threshold decision.").
 
 
 25
 Although we have not established a minimum level of public comment and participation required by the regulations governing the EA and FONSI process, we clearly have held that the regulations at issue must mean something. Cf. Hart v. McLucas, 535 F.2d 516, 519 (9th Cir.1976) ("[I]n the construction of administrative regulations ..., it is presumed that every phrase serves a legitimate purpose...."). It is evident, therefore, that a complete failure to involve or even inform the public about an agency's preparation of an EA and a FONSI, as was the case here, violates these regulations. This wholesale neglect of the regulations' mandatory inclusion of the public in the process results in a procedural injury.[4] Moreover, it undermines the very purpose of NEPA, which is to "ensure[] that federal agencies are informed of environmental consequences before making decisions and that the information is available to the public." Okanogan Highlands Alliance v. Williams, 236 F.3d 468, 473 (9th Cir.2000).
 
 
 26
 Standing may properly hinge on this type of injury. We have determined that an environmental plaintiff was "surely ... harmed [when agency action] precluded the kind of public comment and participation NEPA requires in the EIS process," and that this type of "procedural" injury is tied to a substantive "harm to the environment" — "`the harm consists of added risk to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with public comment) of the likely effects of their decision on the environment. NEPA's object is to minimize that risk, the risk of uninformed choice....'" West v. Sec'y of Dep't of Transp., 206 F.3d 920, 930 n. 14 (9th Cir.2000) (quoting Sierra Club v. Marsh, 872 F.2d 497, 500 (1st Cir.1989)). The same can be said for failure to allow any public input in the EA/FONSI process, which is, after all, the threshold step for determining whether to prepare an EIS in the first place.
 
 
 27
 Citizens also allege that the USDA failed to comply with the procedural consultation and biological-assessment requirements of the ESA before promulgating the 2000 Plan Development Rule. This type of procedural injury is also cognizable for standing purposes. See Envtl. Prot. Info. Ctr. v. Simpson Timber Co., 255 F.3d 1073, 1079 (9th Cir.2001).[5]
 
 2. Concrete Interests
 
 28
 "`In NEPA cases, we have described [the] concrete interest test as requiring a geographic nexus between the individual asserting the claim and the location suffering an environmental impact.'" Public Citizen, 316 F.3d at 1015 (quoting Cantrell, 241 F.3d at 679).[6] That is, environmental plaintiffs must allege that they will suffer harm by virtue of their geographic proximity to and use of areas that will be affected by the USDA's policy.
 
 
 29
 Citizens have done just that. They have properly alleged, and supported with numerous affidavits covering a vast range of national forests around the country, that their members use and enjoy national forests, where they observe nature and wildlife. The Supreme Court has held that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons `for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." Laidlaw, 528 U.S. 167, 182, 120 S.Ct. at 705 (quoting Sierra Club v. Morton, 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)).
 
 
 30
 Citizens need not assert that any specific injury will occur in any specific national forest that their members visit. "The `asserted injury is that environmental consequences might be overlooked' as a result of deficiencies in the government's analysis under environmental statutes." Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1355 (9th Cir.1994). "Were we to agree with the district court that a NEPA plaintiff's standing depends on `proof' that the challenged federal project will have particular environmental effects, we would in essence be requiring that the plaintiff conduct the same environmental investigation that he seeks in his suit to compel the agency to undertake." City of Davis v. Coleman, 521 F.2d 661, 670-71 (9th Cir.1975).
 
 3. Reasonable Probability
 
 31
 Environmental plaintiffs "`seeking to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs,' ... can establish standing `without meeting all the normal standards for ... immediacy.'" Hall, 266 F.3d at 975 (quoting Defenders of Wildlife, 504 U.S. at 572 & n. 7, 112 S.Ct. 2130). Rather, they "need only establish `the reasonable probability of the challenged action's threat to [their] concrete interest.'" Id. at 977 (quoting Churchill County, 150 F.3d at 1078).
 
 
 32
 Citizens correctly assert that the 2000 Plan Development Rule decreases substantive environmental requirements (thus injuring their concrete interest in enjoying the national forests) as compared to the 1982 Plan Development Rule.[7] The 2000 Rule decreased the species viability requirement from one in which the USDA must "insure" that forest conditions support the viability of existing species, to one in which the USDA must only guarantee a "high likelihood" of supporting their viability. Compare 65 Fed.Reg. at 67,575 (amending 36 C.F.R. § 219.20(b)(2)) (2000 Rule), with 47 Fed.Reg. at 43,048 (creating 36 C.F.R. § 219.19) (1982 Rule).
 
 
 33
 The 2000 Rule also eliminated many of the "minimum specific management requirements" that were part of the 1982 Rule. 47 Fed.Reg. at 43,050 (creating 36 C.F.R. § 219.27). For example, the EPA observed in its comments on the draft 2000 Rule that "while [the 1982 Rule] contain[s] specific limits on clear cutting [of trees], the proposed [2000 Rule] would require only that individual forest plans `provide standards and guidelines for timber harvest and regeneration methods,'" and asked "[h]ow will the proposed [2000 Rule] ensure requirements necessary for sustainability?"
 
 
 34
 Finally, the 2000 Plan Development Rule eliminated the post-decision appeal process of 36 C.F.R. pt. 217, and replaced it with a pre-decision "objection" process. 65 Fed.Reg. at 67,568 (removing 36 C.F.R. pt. 217); id. at 67,578 79 (creating 36 C.F.R. § 219.32). Under the 2000 Rule, members of the public wishing to object to an amendment or revision of an LRMP have 30 days from the date an EIS is made available to do so, see id., while under the procedures it replaced, they had 90 days from the notice of the final rule to do so, 36 C.F.R. § 217.8(a)(3) (1999). Citizens aver that this change has harmed them and will continue to harm them because the 30-day period is insufficient for comprehensive review of proposed agency actions and thus impairs their ability to file any objections.
 
 
 35
 The 2000 Plan Development Rule in fact does not result in any direct environmental effects. Its environmental impact is indirect: because the Rule controls the development of LRMPs and site-specific plans, it is through these that it poses an actual, physical effect on the environment in national forests and grasslands.[8] The USDA argues that the indirect effect that any changes to a plan development rule poses to the physical environment — compounded by the fact that any LRMPs created pursuant to the 2000 Plan Development Rule would be subject to the requirements of NEPA — compels a finding that there is an insufficient connection between the asserted procedural injury and the concrete interests at stake.
 
 
 36
 Our precedent compels us to conclude otherwise. We have rejected the reasoning urged upon us by the USDA in at least three cases. See Resources Ltd. v. Robertson, 35 F.3d 1300 (9th Cir.1994); Salmon River Concerned Citizens, 32 F.3d at 1346; Idaho Conservation League, 956 F.2d at 1508. In Idaho Conservation, environmental plaintiffs challenged an LRMP for the Idaho Panhandle Forest, claiming its substantive provisions violated the NFMA, and that its accompanying environmental analysis violated NEPA. 956 F.2d at 1510. We acknowledged that "[d]irect implementation of the LRMP occurs at a second stage, when individual site-specific projects are proposed and assessed," and that these site-specific projects entailed further NEPA analysis. Id. at 1512. We went on to reject the Forest Service's argument that "the effect of the challenged action is too remote to sustain standing," id. at 1515, reasoning:
 
 
 37
 Notwithstanding the fact that [the LRMP's] concrete effect might be seriously mitigated at the site-specific level, [it] represent[s] [an] important decision[]. This becomes particularly clear if we bear in mind the statutory source that defines appellants' right and imposes appellees' duty. The standing examination, in other words, must focus on the likelihood that the defendants' action will injure the plaintiff in the sense contemplated by Congress.
 
 
 38
 Viewed in this light, and whether or not it is irrevocable, the [Forest] Service's decision is harmful for standing purposes. The [plaintiff's] complaint is that the faulty EIS had made possible development that wilderness designation would have prevented. Pursuant to NEPA and the NFMA, these are injuries that we must deem immediate, not speculative. Indeed, short of assuming that Congress imposed useless procedural safeguards, and that wilderness designation is a superfluous step, we must conclude that the [LRMP] plays some, if not a critical, part in subsequent decisions.
 
 
 39
 More importantly perhaps, if the agency action only could be challenged at the site-specific development stage, the underlying programmatic authorization would forever escape review. To the extent that the plan pre-determines the future, it represents a concrete injury that plaintiffs must, at some point, have standing to challenge.
 
 
 40
 Id. at 1516 (emphases in original).
 
 
 41
 In Salmon River, plaintiffs challenged the Forest Service's "vegetation management policy" for the Pacific Southwest Region and the accompanying EIS as violating NEPA. 32 F.3d at 1348. The policy permitted for the first time the use of herbicides in certain circumstances in regional forests, but "delegat[ed] to district foresters, for the most part, the discretion to apply herbicides at the project level." Id. at 1351. We held that the plaintiffs had standing to sue:
 
 
 42
 [U]nfettered use of herbicides in [this region] in the absence of NEPA compliance will cause harm to visitors' recreational use and enjoyment, if not to their health. Speculation that the application of herbicides might not occur is irrelevant. The asserted injury is that environmental consequences might be overlooked, as a result of deficiencies in the government's analysis under environmental statutes.
 
 
 43
 Id. at 1355 (quoting Idaho Conservation, 956 F.2d at 1518).
 
 
 44
 In Resources Limited, we found that environmental groups challenging a "forest-wide" plan had standing to sue, despite their "inability to point to the precise area of the park where their injury will occur." 35 F.3d at 1303. We specifically reaffirmed the holding in Idaho Conservation, rejecting the Forest Service's contention that the Supreme Court's intervening Lujan decision undermined its validity. Id.
 
 
 45
 Against this weight of controlling authority, the USDA cites a conflicting subsequent decision from the D.C. Circuit. See Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658, 667 (D.C.Cir.1996) (en banc). According to the USDA, Florida Audubon requires us to hold that in procedural injury cases involving "broad rulemaking" as opposed to "government action ... located at a particular site," heightened standing scrutiny applies. With all due respect for our sister circuit, we are bound to follow the law of the Ninth Circuit. Moreover, in announcing this rule it was the D.C. Circuit that placed itself in conflict with our rule, as it recognized when it rendered Florida Audubon. See id. at 675 (Rogers, J., dissenting) ("[The majority's new rule] places this circuit in conflict with the Ninth Circuit, which has frequently found standing in cases similar to this one."); see also id. (citing Idaho Conservation, 956 F.2d at 1516). Furthermore, we believe the rule of the Ninth Circuit is correct, and is followed by at least one other circuit. As Judge Rogers notes, the Seventh Circuit follows our rule, although the Eighth and Eleventh Circuits prefer the D.C. Circuit's approach. Id. at 675 n. 5.
 
 
 46
 The Florida Audubon decision may also be distinguished factually. That case is characterized by a "lengthy chain of conjecture" which is far more attenuated than the injury here, and thus implicates significant causation concerns: there "appellants contend[ed] that [a] tax credit will cause more ETBE production, which in turn will cause more ethanol production, which consequently will cause more production of the corn and sugar necessary for ethanol production, which will then cause more agricultural pollution, which, as this pollution is likely to occur on farmland bordering wildlife areas appellants visit, is also likely to harm the areas visited by appellants." Id. at 666. Here, in contrast, Citizens simply assert that regional LRMPs and, thus, site-specific plans will follow the requirements of national rules (as they must), such that decreased substantive national rules will likely result in less environmental protection at the regional and site-specific levels. Therefore, the chain of causation and the likelihood of injury, while indirect, are far less attenuated and much more likely to occur.
 
 
 47
 Therefore we reaffirm, as we have repeatedly done in the face of USDA arguments to the contrary, that environmental plaintiffs have standing to challenge not only site-specific plans, but also higher-level, programmatic rules that impose or remove requirements on site-specific plans.
 
 
 48
 The USDA's only remaining argument is that, while Citizens have standing to challenge LRMPs and other programmatic rules that are one step removed from site-specific plans, they should not have standing to challenge the 2000 Plan Development Rule which is two steps removed from site-specific plans. Although this assertion is simply a restatement of the USDA's direct/indirect injury argument, we dispose of it for two additional reasons.
 
 
 49
 First, there are several provisions in the 2000 Plan Development, one about which Citizens specifically complain, that apply directly to site-specific plans. See Inland Empire Pub. Lands Council v. United States Forest Serv., 88 F.3d 754, 760 n. 6 (9th Cir.1996) (holding that the species "viability" requirement applies to site-specific plans).
 
 
 50
 Second, such line-drawing seems inherently arbitrary. The relevant inquiry for the immediacy requirement in the procedural context is whether there is a "reasonable probability" that the challenged procedural violation will harm the plaintiffs' concrete interests, Hall, 266 F.3d at 977, not how many steps must occur before such harm occurs. An examination of the three-tiered regulatory system for the management of national forests and grasslands reveals that when the 2000 Plan Development Rule is implemented, harm to Citizens' concrete interests is reasonably probable. Even components of the 2000 Rule that apply indirectly to site-specific plans will (with reasonable probability) influence for the worse the environmental safeguards in LRMPs promulgated thereunder, which in turn will likely result in less environmental safeguards at the site-specific plan level.
 
 
 51
 The USDA's argument to the contrary — that there is no reason to believe that lower environmental safeguards at the national programmatic level will result in lower environmental standards at the site-specific level — suggests that it conceives of plan development rules merely as exercises in paper-pushing. "[S]hort of assuming that Congress imposed useless procedural safeguards, and that [the plan development rule] is a superfluous step, we must conclude that [it] plays some, if not a critical, part in subsequent [lower-level] decisions." Idaho Conservation, 956 F.2d at 1516.
 
 
 52
 Thus, Citizens have demonstrated that they suffered a cognizable injury in fact.
 
 B. Causation and Redressability
 
 53
 "`Once a plaintiff has established an injury in fact under NEPA, the causation and redressability requirements are relaxed.'" Public Citizen, 316 F.3d at 1016 (quoting Cantrell, 241 F.3d at 682). There is no dispute about causation in this case, because this requirement is only implicated where the concern is that an injury caused by a third party is too tenuously connected to the acts of the defendant. Idaho Conservation, 956 F.2d at 1518 ("The causation question concerns only whether plaintiffs' injury is dependent upon the agency's policy, or is instead the result of independent incentives governing [a] third part[y's] decisionmaking process.").
 
 
 54
 The final standing inquiry, redressability, requires a court to determine whether it possesses the ability to remedy the harm that a petitioner asserts. A petitioner "`who asserts inadequacy of a government agency's environmental studies... need not show that further analysis by the government would result in a different conclusion. It suffices that ... the [agency's] decision could be influenced by the environmental considerations that [the relevant statute] requires an agency to study.'" Public Citizen, 316 F.3d at 1019 (quoting Hall, 266 F.3d at 977 (internal citation omitted and emphasis added)).
 
 
 55
 USDA is required by statute to "insure that ... environmental amenities and values... be given appropriate consideration in [administrative] decisionmaking." 42 U.S.C. § 4332(2)(B). Thus, Citizens has a relatively easy burden to meet in this case. It is probable that if USDA had allowed Citizens to participate in its environmental review at some point, or had complied with the ESA formal consultation requirement, this could have influenced its decision to promulgate the 2000 Plan Development Rule.
 
 C. Additional Standing Requirements
 
 56
 "`An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" Public Citizen, 316 F.3d at 1019 (quoting Laidlaw, 528 U.S. at 181, 120 S.Ct. 693). Here, Citizens have adequately alleged injury to their members. The interests at stake — preventing environmental damage to national forests and grasslands due to decreased regulatory oversight — are pertinent to the interests of environmental organizations such as Citizens. Finally, there is no indication that resolving this case would require, or even be assisted by the participation of Citizens' individual members.
 
 
 57
 In addition to the constitutional requirements for standing, a petitioner "`who brings a statutory enforcement action under the [APA] must meet its statutory requirements for standing. The plaintiff must establish (1) that there has been final agency action adversely affecting the plaintiff, and (2) that, as a result, it suffers legal wrong or that its injury falls within the zone of interests of the statutory provision the plaintiff claims was violated.'" Public Citizen, 316 F.3d at 1019 (quoting Churchill County, 150 F.3d at 1078).[9] The USDA's designation of the rule as a "Final Rule" satisfies the first requirement.
 
 
 58
 As for the second requirement, the APA has been held to "require that the `interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" Id. at 1019-20 (quoting Presidio Golf Club v. Nat'l Park Serv., 155 F.3d 1153, 1158 (9th Cir.1998)). "As might be expected, `NEPA's purpose is to protect the environment.'" Id. (quoting W. Radio Servs. Co. v. Espy, 79 F.3d 896, 902-03 (9th Cir.1996)). Here, Citizens are plainly trying to protect the environment, and their suit thus lies well within NEPA's zone of interests. Therefore, Citizens have standing to bring this suit.
 
 IV. Ripeness
 
 59
 The USDA also argues that this case is not ripe for review, relying on the Supreme Court's decision in Ohio Forestry Ass'n. There, the Supreme Court announced a three-pronged test for ripeness of an administrative challenge:
 
 
 60
 (1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented.
 
 
 61
 523 U.S. at 733, 118 S.Ct. 1665.
 
 
 62
 Judicial intervention would not interfere with further administrative action because the 2000 Plan Development Rule is at an administrative resting place: the USDA is working to produce a replacement rule, and the 2000 Rule exists as an optional protocol for the agency to follow in the interim. Moreover, no further factual development is necessary for a judicial determination.
 
 
 63
 The only real issue concerns the existence of hardship to Citizens. Ohio Forestry answers this question differently depending on whether a substantive or procedural challenge is made. Because Ohio Forestry involved a challenge to the substance of certain national forest rules under NFMA, id. at 728, 118 S.Ct. 1665, the Supreme Court determined that there was no hardship to the plaintiffs because the plans had not yet been implemented at the site-specific level, id. at 733-34, 118 S.Ct. 1665. The Court specifically distinguished its holding from a hypothetical case in which a procedural injury was claimed: "[T]he [national forest rules does not] resemble an environmental impact statement prepared pursuant to NEPA.... [A] person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper." Id. at 737, 118 S.Ct. 1665.[10] We have recently adopted this dicta from Ohio Forestry, finding that a NEPA challenge was ripe because the injury occurred "when the allegedly inadequate EIS was promulgated." Kern, 284 F.3d at 1071.
 
 
 64
 The USDA attempts to distinguish Kern and other cases recognizing this principle because in many of them site-specific action was already planned. Although that may be true to one degree or another in each case, none of the cases relies on that circumstance at all in its ripeness analysis. Indeed, most recite the Supreme Court's rule that a NEPA injury becomes ripe when the procedural violation occurred, and that the claim can never get riper. Thus, the imminence or lack thereof of site-specific action is simply a factual coincidence, rather than a basis for legal distinction. Moreover, there is some indication that, although not imminent, "several forests ... have begun revisions to their [LRMPs] under the November 2000 Rule," 66 Fed.Reg. at 27,553, so in fact this is not a basis for distinguishing Kern in any event, although we reiterate that the planning of site-specific action vel non is irrelevant to the ripeness of an action raising a procedural injury.
 
 
 65
 In point of fact, the 2000 Plan Development Rule has already been implemented in part. In proposing the most recent LRMP for the Interior Columbia Basin Ecosystem Management Project, the USDA has implemented the 2000 Rule's 30-day protest protocol. Furthermore, the USDA has already withdrawn the regional guides required by the 1982 Plan Development Rule. Therefore, this matter is ripe for review.
 
 V. Conclusion
 
 66
 Citizens have standing to bring this suit and the case is ripe for decision. We do not reach the merits of Citizens' appeal on their motion for injunctive relief, however, because the district court did not reach the merits of the motion.
 
 
 67
 REVERSED AND REMANDED.
 
 
 
 Notes:
 
 
 [1]
 Appellants are Citizens for Better Forestry, Ecology Center, Gifford Pinchot Task Force, Kettle Range Conservation Group, Idaho Sporting Congress, Friends of the Clearwater, Utah Environmental Congress, Cascadia Wildlands Project, Klamath Siskiyou Wildlands Center, Southern Appalachian Biodiversity Project, Headwaters, and Lands Council
 
 
 [2]
 Under NEPA, federal agencies must issue a substantial analysis called an Environmental Impact Statement in conjunction with any "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C);see also 40 C.F.R. pt. 1502. In certain circumstances, where it is not clear whether a full EIS is required, agencies prepare a more concise Environmental Assessment to evaluate preliminarily the need to prepare a full EIS. 40 C.F.R. § 1501.4(b)-(c). See generally Public Citizen v. Dep't of Transp., 316 F.3d 1002, 1021 (9th Cir.2003).
 
 
 [3]
 The ESA, 16 U.S.C. § 1531-1544, requires that each federal agency, prior to engaging in any "action" — including the "promulgation of regulations," 50 C.F.R. § 402.02 — consult with the relevant Secretary (Commerce for marine species, Interior for non-marine species) to determine whether the action jeopardizes or affects any endangered or threatened species. 16 U.S.C. § 1536(a)(2)-(3). If an initial consultation with the Secretary reveals that such species may be present, the agency must prepare a "biological assessment" of its action, which it may do in conjunction with its NEPA environmental analysisId. § 1536(c). The agency need not formally consult with the Secretary if it does so informally, and concludes as a result that no listed species or habitat will be affected. 50 C.F.R. § 402.14(b)(1).
 
 
 [4]
 The parties dispute whether the hearings that the USDA did conduct, and during which public comment was solicited, focused exclusively on the substance of the proposed rule or on its environmental impact. We adopt Citizens' position — that the hearings focused exclusively on the substance of the proposed rule — because it comports with the discussion of public comments to the 2000 Rule Development Plan in theFederal Register, 65 Fed.Reg. at 67,567, and the USDA has offered no contrary evidence.
 
 
 [5]
 The USDA argues that it, in fact, complied with these ESA requirements. Because the record is insufficient on this question, we leave its determination to the district court. Regardless of the USDA's compliance, Citizens have standing to raise the objection. A contrary rule would allow only successful environmental plaintiffs standing to bring their claims
 
 
 [6]
 TheCantrell case, like many other Ninth Circuit cases addressing similar issues, dealt only with claims under NEPA. Here, Citizens assert violations of the procedural aspects of both NEPA and ESA. Thus, although many of the cases cited in this section speak of NEPA specifically, the analysis is equally applicable to claims of any procedural environmental injury (e.g., failure to conduct sufficient environmental analysis) under Lujan. Cf. Public Citizen, 316 F.3d at 1015 (applying same rules to standing to challenge procedural violations of the Clean Air Act).
 
 
 [7]
 Citizens rely on memoranda prepared by various federal officials and agencies, which were appended to their trial counsel's affidavit submitted in opposition to the USDA's motion for summary judgment. Although these documents confirm our reading of the rules at issue, characterizing them as "relaxing" environmental requirements that were present in the earlier version, the district court correctly rejected them as inadmissible under Federal Rule of Civil Procedure 56(e), as they are neither properly authenticated nor self-authenticatingSee Orr v. Bank of Am., NT & SA, 285 F.3d 764, 773-74 (9th Cir.2002); Fed.R.Evid. 902(1)-(2) (requiring public documents to either be signed under seal or attached to a certification signed under seal). Our determination that the substantive requirements were minimized by the 2000 Rule is based upon a comparison of the rules themselves.
 
 
 [8]
 Although the parties debate this issue (at length) in their "causation" analysis, it is in fact more appropriately addressed as a component of the injury-in-fact inquirySee, e.g., Idaho Conservation League v. Mumma, 956 F.2d 1508, 1517-18 (9th Cir.1992) ("It is common to confuse the issue of the likelihood of harm with its cause. `The likelihood of the injury, whether or not that likelihood depends upon a single event or a chain of events, is properly a concern of the personal injury inquiry. The causation question concerns only whether plaintiffs' injury is dependent upon the agency's policy, or is instead the result of independent incentives governing the third parties' decisionmaking process.'" (quoting Wilderness Soc'y v. Griles, 824 F.2d 4, 18 (D.C.Cir.1987))).
 
 
 [9]
 This "statutory" standing requirement is inapplicable to citizen suits brought directly under the ESABennett v. Spear, 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997).
 
 
 [10]
 The USDA claims that there was a NEPA claim in theOhio Forestry case, that was dismissed, sub silentio, as unripe as well. It appears that there may indeed have been such a claim before the district court, see id. at 731, 118 S.Ct. 1665, but it was not addressed by the Sixth Circuit, id. at 732, 118 S.Ct. 1665, or by the Supreme Court in its opinion. In any event, such an assertion cannot trump the Supreme Court's clear pronouncement that NEPA cases become ripe at the moment the NEPA violation occurs.