**CITIZENS FOR BETTER,
et al, Plaintiff,**

v.

**US DEPT OF AGRICULTURE,
et al, Defendant.**

**No. C01–00728 MJJ.**

United States District Court,
N.D. California.

April 17, 2007.

Michael Axline, Peter M.K. Frost, Eugene, OR, Brent Plater, Environmental Law & Justice Clinic, San Francisco, CA, Marc D. Fink, Attorney at Law, Duluth, MN, for Plaintiff.

Andrew Smith, U.S. Dept of Justice c/o U.S. Attorney's Office, Environment and Natural Resources Div., Albuquerque, NM, Robert Swan Mueller, III, James A. Coda, United States Attorney, San Francisco, CA, for Defendant.

**ORDER RE FEDERAL DEFENDANTS' MOTION FOR *DE NOVO* REVIEW OF OBJECTIONS TO THE MAGISTRATE'S JULY 24, 2006, AND NOVEMBER 3, 2006 REPORT AND RECOMMENDATION FOR ATTORNEYS' FEES AND COSTS**

JENKINS, District Judge.

Before the Court is Federal Defendants' timely filed Motion for De Novo Review of Objections to Magistrate Chen's July 24, 2006 and November 3, 2006 Report and Recommendation for Attorneys' Fees and Costs. (Doc. Nos. 142 and 153) Plaintiffs responded to the Defendants objections.

The Court has read and considered Defendants' objections, reviewed the memoranda submitted by the parties and heard oral argument in this matter on March 13, 2007. Having fully considered the arguments of counsel and having reviewed, De Novo, the record in this matter, the Court overrules Defendant's objections to Magistrate Chen's Report and Recommendation dated July 24, 2006 and November 3, 2006, and adopts, without change, Judge Chen's recommendations regarding Plaintiff's request for attorneys fees and costs. 28 U.S.C. § 636(b)(1)(B) & (C) (2005) and Federal Rule of Civil Procedure 72(b).

Accordingly, the Court awards Plaintiffs attorneys fees and costs in the total amount of $67,823.18 as described below:

1) $45,631.12 in attorneys fees on the merits;
2) $15,768.76 for fees on the fees motion; and
3) $6,423.30 for costs.[1]

**IT IS SO ORDERED.**

**REPORT AND RECOMMENDATION RE PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS**

EDWARD M. CHEN, United States Magistrate Judge.

## I. *INTRODUCTION*

On February 16, 2001, Plaintiffs, a coalition of twelve environmental groups [1], sued Defendants, the United States Department of Agriculture ("USDA") and the United States Forest Service ("Forest Service"), alleging substantive violations under the National Forest Management Act ("NFMA") and procedural violations under the Endangered Species Act ("ESA") and the National Environmental Protection Act ("NEPA"). The suit stems from the USDA's promulgation of a new national forest management policy (the "2000 Final Rule") governing the Forest Service's administration and management of National Forest System lands.

After the suit was filed, the USDA suspended and reviewed the 2000 Final Rule, announcing in December 2001 that a new rule would replace the 2000 Rule. Plaintiffs agreed to stay the substantive claims herein and moved for partial summary judgment on their procedural claims. The USDA filed a cross-motion for summary judgment, alleging that Plaintiffs lacked standing to challenge the 2000 Final Rule and that the claims were not ripe for review. District Judge Martin J. Jenkins of this Court held that Plaintiffs lacked standing to sue and that the procedural challenge to the 2000 Final Rule was not ripe for review. Order of February 20, 2002. The Ninth Circuit reversed the District Court's decision and held that Plaintiffs did have standing to assert to NEPA and ESA claims and that the case was ripe. *Citizens for Better Forestry v. U.S. Dept. of Agriculture,* 341 F.3d 961 (9th Cir.2003). The USDA subsequently withdrew the 2000 Final Rule and issued a new final rule. Plaintiffs thus dismissed this case.

Plaintiffs subsequently filed for a motion for attorneys' fees pursuant to the ESA and the EAJA. That motion was referred to this Court for report and recommendation. A hearing was held on April 26, 2006. For the reasons stated below, this Court recommends that Plaintiffs' motion for attorneys' fees be granted as to the NEPA claim but not the ESA claim. It further orders Plaintiffs to submit supplemental briefing on the amount of reasonable attorneys' fees and costs attributable to the NEPA claim.

## II. *BACKGROUND*

### A. *Historical Overview*

National forests and grasslands are managed by the Forest Service, an agency within the USDA. This agency utilizes a three-tiered approach to forest management, prescribed by the Forest and Rangeland Renewable Resources Planning Act of 1974 and the NFMA of 1976. *Citizens for Better Forestry,* 341 F.3d at 966. National uniform regulations promulgated

1. This Order terminates Docket entries Nos. 99 and 142.

1. Plaintiffs are Citizens for Better Forestry, Ecology Center, Gifford Pinchot Task Force, Kettle Range Conservation Group, Idaho Sporting Congress, Friends of the Clearwater, Utah Environmental Congress, Cascadia Wildlands Project, Klamath Siskiyou Wildlands Center, Southern Appalachian Biodiversity Project, Headwaters, and Lands Council.

by the Secretary of Agriculture constitute the highest tier of regulatory oversight of the forest management system and govern the development and revision of the regional and local plans. *Id.* (citing 16 U.S.C. § 1604(g)(1)). They also set broad guidelines, that are followed when preparing regional and site-specific plans, regarding plant and animal species conservation, timber management, and water management. *Id.*

The USDA promulgated the first national forest-management plan development rule in 1979, accompanied by a full Environmental Impact Statement ("EIS") which analyzed the environmental impact of the regulation. *Id.* at 966. This rule was short-lived and was substantially revised in 1982. *Citizens,* 341 F.3d at 966. When initially published in the Federal Register as a draft rule, the 1982 Plan Development Rule was accompanied by a brief Environmental Assessment ("EA"), but not a full EIS.[2] *Id.* The 1982 Plan Development Rule set out a comprehensive approach to forest management, implementing the statutory directive. *Id.* (citing 47 Fed.Reg. 43,026, 43,038, Sept. 30, 1982). The 1982 Rule required that "fish and wildlife habitat shall be managed to maintain viable populations [there-of]," further defining a "viable" population as "one which has estimated numbers and distribution ... in the [relevant] area." *Id.* (citing 47 Fed.Reg. at 43,048). It also required the development of "regional guides" which "provided standards and guidelines for addressing major issues and management concerns which need to be considered at the regional level to facilitate forest planning." *Id.* (citing 47 Fed.Reg. 43,042). In addition, the Rule contained "minimum specific management requirements," setting forth mandatory directives which all regional "land and resource management plans" ("LRMP") must follow, and specific, quantifiable baselines below which no LRMP or site-specific plan can fall. *Id.* (citing 47 Fed.Reg. 43,050).

B. *The 2000 Plan Development Rule*

The USDA unsuccessfully attempted to amend the 1982 Rule. That effort culminated in 1995 with a draft rule that was never finalized. *Citizens,* 341 F.3d at 967. Subsequently, the Secretary of Agriculture convened a 13–member scientist committee under 16 U.S.C. § 1604(h), to offer recommendations for revising the plan development rules. After conducting public meetings and conferences, the USDA published a proposed rule in late 1999, soliciting further public comment. *Id.* (citing 64 Fed.Reg. 54,074 (Oct. 5, 1999)). The public comment period ran from October 5, 1999 through February 10, 2000. *Id.* (citing 65 Fed.Reg. 67,514, 67,517 (Nov. 9, 2000)).

Unlike previous draft development rules, the proposed rule did not include an environmental impact analysis nor did it solicit specific comments regarding its environmental impact. The USDA stated that it would complete an "environmental review" at some point before the adoption of a final rule. *Citizens,* 341 F.3d at 967 (citing 64 Fed.Reg. at 54,094). It claimed that it complied with NEPA by preparing an EA and Finding of No Significant Impact ("FONSI") dated July 21, 2000—over five months *after* the close of the commend period for the proposed rule. The documents were never published in the Federal

2. Under NEPA, federal agencies must issue a substantial analysis called an Environmental Impact Statement in conjunction with any "major Federal action[ ] significantly affecting the quality of the human environment." *Citizens,* 341 F.3d at 966. (citing 42 U.S.C. § 4332(2)(C)). In circumstances where it is not clear whether a full EIS is required, agencies prepare a more concise Environmental Assessment to evaluate preliminarily the need to prepare a full EIS. *Id.* (citing 40 C.F.R. § 1501.4(b)-(c)).

Register. *Id.* The USDA also never completed any "biological assessment" of the Rule's impact on endangered species under the ESA, nor did it engage in formal consultation with the Secretaries of the Interior or Commerce.[3] *Id.* The final version of the 2000 Plan Development Rule was published on November 9, 2000. *Id.* at 968. The published version was not accompanied by any environmental or endangered-species analysis, although it did note the existence of the EA and FONSI. *Id.*

The 2000 Rule modified 1982 NFMA regulations in several ways: changing the species viability requirement by providing that " '[p]lan decisions affecting species diversity must provide for ecological conditions that ... provide a *high likelihood* that those conditions are capable of supporting over time the viability of ... species well distributed throughout their ranges within the plan area.' " *Id.* at 967–68 (quoting 65 Fed.Reg. 67, 575 (Nov. 9, 2000)) (emphasis added by Ninth Circuit). The 1982 Rule had a more stringent requirement that the USDA "insure" the conditions are capable of supporting viability. The 2000 Rule also eliminated the requirement of developing and issuing "regional guides" to maintain regional consistency in forest management and many "specific management requirements." *Id.* at 968. In addition, the Rule eliminated the post-decision appeal process of 36 C.F.R. § 217 and replaced it with a pre-decision "objection" process. *Id.* at 968. Under this new process, members of the public wishing to object to an amendment or revision of a LRMP have 30 days from the date an EIS is made available to do so. Hence, the process can occur before the finalization of the planned amendment only if the EIS is published more than 30 days before the amended LRMP becomes final. *Id.*

The 2000 Rule contained a transitional provision designed to facilitate the move from the requirements of the 1982 Rule: USDA officials were permitted to comply with either the 1982 Rule or the 2000 Rule for plans that were under revision at the time and for which final or draft EISs would be completed by May 9, 2001. *Id.* at 968. A technical amendment issued a few weeks later which clarified that the choice to comply with either rule included the choice to comply with either the old appeal rules or the new objection process. *Id.* (citing 66 Fed.Reg. 1864, 1965–66 (Jan. 10, 2001)).

### C. *District Court and Ninth Circuit Proceedings*

Plaintiffs filed their Complaint on February 16, 2001, alleging that Defendants violated substantive provisions of the NFMA and procedural requirements pursuant to ESA and NEPA in promulgating the 2000 Final Rule. Specifically, Plaintiffs claimed that (1) the Rule violated the NFMA as it was "arbitrary and capricious, an abuse of discretion, and contrary to NFMA" since it failed to provide certain protectionary measures and guidelines for the environment; (2) Defendants violated NEPA by not preparing an EIS for the

3. The ESA requires that each federal agency, prior to engaging in any "action," including the promulgation of any regulations, consult with the relevant Secretary (Commerce for marine species, Interior for non-marine species) to determine whether the action jeopardizes or affects any endangered or threatened species. 16 U.S.C. § 1536(a)(2)-(3). If an initial consultation with the Secretary reveals that such species may be present, the agency must prepare a "biological assessment" of its action, which it may do in conjunction with its NEPA environmental analysis. *Id.* § 1536(c). The agency need not formally consult with the Secretary if it does so informally, and concludes as a result that no listed species or habitat will be affected. 50 C.F.R. § 402.14(b)(1).

Rule, not developing an adequate evidentiary record and EA before concluding that no EIS was necessary, and failing to provide public notice and seek public input for the EA and FONSI, and (3) Defendants violated Section 7 of ESA by not consulting with expert agencies regarding the potential impacts of the Rule on threatened and endangered species. Pl.'s Complaint, ¶¶ 16–25 (filed Feb. 15, 2001). Plaintiffs sought declaratory relief that the USDA violated the law in developing and promulgating the 2000 Rule, and injunctive relief to set aside the 2000 Rule pending compliance with the law. *Id.* at 25–26. Plaintiffs specifically sought a declaration that Defendants violated NEPA and ESA. *Id.* at 25.

In April of 2001, the USDA initiated a substantive review of the 2000 Rule ("Larson Report"). The Larson Report acknowledged the lawsuit filed by Plaintiffs (Pl.'s Memo in Support of Motion for Attorney's Fees, Ex. A, p. 3 (April 10, 2001)), and identified "serious" implementation problems associated with the 2000 Rule; it further provided a series of recommendations to the Government as to how to proceed with the rulemaking process. *Id.*, pp. 1–2. On May 17, 2001, the USDA announced that it was considering revising the Rule, noting "serious concerns that have arisen regarding some of the provisions of the Rule, including its impact on 'ecological sustainability and species viability.' " *Citizens for Better Forestry,* 341 F.3d at 968, (quoting 66. Fed.Reg. 27, 552 (May 17, 2001)). The USDA's announcement again noted the existence of this lawsuit as one of the reasons behind its decision. *Id.* The announcement also modified the 2000 Rule's transitional provision, extending until May 9, 2002, the period within which USDA officials could choose to follow either the 1982 Rule or the 2000 Rule. *Id.*

In December of 2001, the USDA definitively announced that it was developing a new rule to replace the 2000 Final Rule and planned to have it in place by mid-2002. *Id.* at 968 (citing Fed.Reg. 61, 400 (Dec. 3, 2001)). When it was clear that the USDA could not meet this timetable, it again amended the transitional provision to allow USDA officials to choose between the 1982 and 2000 Rules until the Department of Agriculture promulgated the revised final planning regulations announced in December 2001. *Id.* at 968–69.

Plaintiffs and the USDA then stipulated to stay the portion of the litigation challenging the substantial merits of the 2000 Final Rule pending the Rule's revision. The procedural challenge under NEPA and ESA to the 2000 Rule was not stayed. Plaintiffs moved for partial summary judgment on its procedural claims and sought to enjoin any further implementation of the 2000 Final Rule until the procedural violations had been cured. The USDA filed a cross-motion for summary judgment, alleging that Plaintiffs lacked standing to challenge the 2000 Final Rule and that the claims were not ripe for review. On February 20, 2002, the District Court held that Plaintiffs lacked standing to sue and that their procedural challenges to the 2000 Final Rule were not ripe for review. Order of Feb. 20, 2002. Plaintiffs appealed.

The USDA then issued another interim rule to extend the date by which forest plan amendments and revisions were required to comply with the 2000 Final Rule. 67 Fed.Reg. 35,431 (May 20, 2002). On December 6, 2002, the USDA published its new draft forest planning rule in the Federal Register which identified this case as part of the reason it initiated a review of the Rule. 67 Fed.Reg. 72,770–771 (Dec. 6, 2002). Specifically, the USDA stated:

> In addition, lawsuits challenging the promulgation of the rule were brought by a coalition of 12 environmental groups from 7 states and by a coalition of industry groups (*Citizens for a Better Forestry v. USDA,* No. C–01–0728–BZ(N.D. Calif., filed February 16, 2001)) and (*American Forest and Paper Ass'n v. Veneman,* No. 01–CV–00871 (TPJ) (D.D.C., filed April 23, 2001)). *As result of these lawsuits* and concerns raised in comments to the Secretary, the Department initiated a review of the 2000 rule focusing on its 'implementability.' The 'NFMA Planning Rule Review,' completed in April 2001, concluded that many of the concerns regarding implementability of the rule were serious and required immediate attention.

*Id.* at 72,771 (emphasis in original).

On August 28, 2003, the Ninth Circuit reversed the District Court's ruling and held that Plaintiffs did have standing and the case was ripe for review. *Citizens,* 341 F.3d at 978. In analyzing Plaintiffs' standing to assert a procedural injury (under NEPA and ESA), the Ninth Circuit held the Plaintiffs must establish injury-in-fact by showing "that the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Id.* at 969 (citations omitted). In particular, the Plaintiff must allege and on summary judgment adduce sufficient facts to show, *inter alia,* that the Defendant violated certain procedural rules protecting Plaintiff's concrete interests. *Id.* In this regard, the Ninth Circuit found that "Citizens were deprived of the opportunity to comment on the USDA's EA and FONSI at all points in the rulemaking process. This deprivation violated their rights under the regulations implementing NEPA." *Id.* at 970. Although the precise minimum level of public comment and participation required by the regulations had not been established by the case law, the panel held "a complete failure [by Defendants] to involve or even inform the public about an agency's preparation of an EA and a FONSI, as was the case here, violate[d] these [NEPA] regulations. This wholesale neglect of the regulations' mandatory inclusion of the public in the process result[ed] in a procedural injury." *Id.* The Ninth Circuit explained that such a failure to allow any public input in the EA/FONSI process resulted in a procedural injury that was necessarily tied to a substantive "harm to the environment" since there was an added risk to the environment when government decision-makers made up their minds without public comment on the likely effects of their decision on the environment. *Id.* "Standing may hinge on this type of injury." *Id.*

As to the ESA procedural claim, the court held that Citizens' allegation that the USDA failed to comply with the procedural consultation and biological assessment requirements of the ESA "is the type of procedural injury ... also cognizable for standing purposes." *Id.* It noted, however, that the USDA disputed whether it in fact complied with these ESA requirements and that "[b]ecause the record is insufficient on *this* question, we leave its determination to the district court." *Citizens,* 341 F.3d at 971 n. 5 (emphasis added). As to the ESA claim, the panel found the Plaintiffs had standing without rendering a conclusion on the merits of the claim. *Id.*

The USDA then extended the transition for site-specific projects in another "interim" rule and Plaintiffs moved to stay the case pending the USDA's promulgation of the new final rule. On January 5, 2005, the USDA issued a new final rule to revise the NFMA regulations and issued a second final rule to remove the 2000 Final Rule. 70 Fed.Reg. 1023 (Jan. 5, 2005). Plaintiffs stipulated to a dismissal of the

case on February 25, 2005. On April 28, 2005, Plaintiffs filed the instant motion for attorneys' fees under the ESA and the EAJA.

## III. *DISCUSSION*

### A. *Equal Access to Justice Act*

#### 1. *Legal Standard*

Plaintiffs seek attorneys' fees and costs pursuant to the EAJA claiming it prevailed on the NEPA claim. *See* Pl.'s Memo. 12:6–18. A party seeking an award of attorney's fees, costs, and other expenses under the EAJA must, within thirty days of final judgment, submit an application which shows that the party is a prevailing party and is eligible to receive an award under the EAJA as well as the amount sought, including an itemized statement from the attorneys. 28 U.S.C. § 2412(d)(1)(B). For the court to award attorneys' fees and costs, it must be shown that (1) plaintiff is the prevailing party; (2) the government has not met its burden of showing that its positions were substantially justified or that special circumstances make the award unjust; and (3) the requested attorneys' fees and costs are reasonable. 28 U.S.C. § 2412(d)(1)(A).

"Plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (citing *Nadeau v. Helgemoe,* 581 F.2d 275, 278–79 (1st Cir.1978)). "A litigant need not prevail on every issue, or even on the 'central issue' in the case, to be considered the prevailing party. It is enough that he succeed 'on any significant claim affording some of the relief sought, either *pendente lite* or at the conclusion of the litigation.'" *Stivers v. Pierce,* 71 F.3d 732, 751 (citing *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.,* 489 U.S. 782, 790–91, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989)). "Prevailing party" status may be established by showing a "material alteration of the legal relationship between the parties." *Tex. State Teachers Ass'n,* 489 U.S. at 792–793, 109 S.Ct. 1486.

A material "alteration of the legal relationship between the parties" may be effectuated by a judgment on the merits or a court-ordered consent decree. *Buckhannon Board v. Dept. of Health & Human Resources,* 532 U.S. 598, 605, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). Such a material change is not a cognizable basis for an award of fees where the desired result was brought about through a voluntary change in the defendant's conduct absent the "judicial *imprimatur*" of *e.g.,* a court-ordered consent decree.[4] *Id.*

However, an enforceable judgment on the merits and a consent decree ordered by a court are only two examples of such a "material alteration in the legal relationship of the parties" warranting fees under a "prevailing party" fee statute such as the EAJA. *Watson v. County of Riverside,* 300 F.3d 1092, 1096 (9th Cir.2002). Other ex-

4. *Buckhannon's* holding also applies to the award of attorney's fees to the "prevailing party" under other federal statutes, such as the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(k), the Voting Rights Act Amendments of 1975, 42 U.S.C. § 1973(e), and the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988. *Id.* at 602–603, 121 S.Ct. 1835. The Ninth Circuit has held that the Supreme Court's "prevailing party" standard applies to EAJA. *See Perez–Arellano v. Smith,* 279 F.3d 791, 794 (9th Cir.2002) ("Although the *Buckhannon* case involves the fee-shifting provisions of the FHAA, 42 U.S.C. § 3613(c)(2), and the ADA, 42 U.S.C. § 12205, the Supreme Court's express rule of decision sweeps more broadly and its reasoning is persuasively applicable to an award of attorney's fees under the EAJA.")

amples include preliminary injunctions. *See Watson,* 300 F.3d at 1096 (holding that the plaintiff was still considered a "prevailing party" pursuant to 42 U.S.C. § 1988 since he had a "judicial *imprimatur*" by successfully obtaining a preliminary injunction, which prohibited the defendants from introducing an arrest report); *Richard S. v. Dept. of Dev. Services of State of Cal.,* 317 F.3d 1080, 1089 (9th Cir.2003) (ruling that the district court erred when it denied the plaintiffs prevailing party status based on their success in obtaining a preliminary injunction). Another example, relevant here, is a declaratory judgment even in the absence of injunctive relief. *See Animal Lovers Volunteer Assoc. v. Carlucci,* 867 F.2d 1224, 1225 (9th Cir. 1989) (finding that the plaintiffs who received a declaratory judgment that the EA did not support a finding of no significant impact could be considered a "prevailing party"); *In re Application of Mgndichian,* 312 F.Supp.2d 1250, 1258–60 (C.D.Cal. 2003) (holding that declaration that administrative forfeiture proceedings were a nullity thereby allowing petitioner to file claim effected a material alteration in parties' legal relationship); *Garnett, By and Through Smith v. Renton School Dist. No. 403,* 1994 WL 555397, *4 (W.D.Wash. Sept., 15, 1994) (holding that the plaintiffs who obtained declaratory relief and nominal damages were prevailing parties since the relief altered the legal relationship between the parties).

In addition to a finding that the plaintiff is a "prevailing party," the court must determine under the EAJA that the position of the United States was "substantially justified" before awarding fees. 28 U.S.C. § 2412(d)(1)(A). The federal government bears the burden of showing that its position was "substantially justified." *ONRC v. Marsh,* 52 F.3d 1485, 1492 (9th Cir.1995). The government must prove that its case had a "reasonable basis in law and in fact." *Pierce v. Underwood,* 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988). "A finding that either the government's underlying conduct which gave rise to the litigation or its litigation position was not substantially justified is sufficient to support an award of EAJA fees." *Cervantez v. Sullivan,* 739 F.Supp. 517, 521 (E.D.Cal.1990) (citing *Andrew v. Bowen,* 837 F.2d 875, 880 (9th Cir.1988)).

2. *Plaintiffs' Entitlement to Award of Fees and Costs*

a. *"Prevailing Party" Status*

This Court finds that Plaintiffs are a "prevailing party" within the meaning of the EAJA because the Ninth Circuit found and declared that the USDA "violated their rights under the regulations implementing NEPA." *Citizens,* 341 F.3d at 970. Its conclusion that the USDA engaged "wholesale neglect of the regulations" "violates these regulations," *id.,* was clear and certain and constituted a finding on the merits of the NEPA claim. In addition to its unequivocal pronouncement, it is noteworthy that the panel went so far as to resolve the parties' dispute over whether hearings conducted by the USDA during which public comment was solicited focused exclusively on the substance of the proposed rule or encompassed its environmental impact. The court resolved that dispute in favor of Citizens' position that the hearings did not address the environmental impact, and thus did nothing to satisfy NEPA. *Id.* at 970 n. 4.

The Ninth Circuit's dispositive declaration that the USDA violated Citizens' rights under NEPA effectuated an "alteration in the legal relationship of the parties" as much as a formal declaratory judgment would have. The Ninth Circuit's ruling on the merits of the NEPA constituted a "judicial *imprimatur*" sufficient to base a fee award under *Buckhannon.*

The Defendants argue that the Ninth Circuit's decision was not a ruling on the merits, but was mere *dicta.*[5] It is true that finding an actual violation of NEPA was not legally necessary in order to find standing. The Ninth Circuit implicitly recognized this in its handling of the ESA claim. It refused to find an ESA violation on the merits and yet concluded Citizens have standing nonetheless. It noted, "A contrary rule would allow only successful environmental plaintiffs standing to bring their claims." *Citizens,* 341 F.3d at 971 n. 5. Defendants also point out that the First Circuit appears to have considered the Ninth Circuit's holding that "[t]he public must be given an opportunity to comment on draft EAs" as *dicta. Alliance to Protect Nantucket Sound v. U.S. Dept. of the Army,* 398 F.3d 105, 115 (1st Cir.2005).

■ Whether another circuit decides to treat a portion of the Ninth Circuit's legal analysis in *Citizens* as *dicta* is besides the point. The Ninth Circuit's decision here is both law of the Circuit and law of the case binding upon the District Court in the case at bar. "Where a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense." *U.S. v. Johnson,* 256 F.3d 895, 914 (9th Cir.2001). Here, the Ninth Circuit's conclusion that the USDA violated NEPA was "germane to the eventual resolution of the case" since it established the injury in fact necessary for standing. That the court could have resolved the standing issue without addressing the merits does not change the fact that its decision establishes law of the circuit.

More importantly, the Ninth Circuit's finding of a NEPA violation is also law of the case binding upon the District Court. On remand, the District Court would have been precluded from ruling contrary to that decided by a higher court in the identical case. *Milgard Tempering, Inc. v. Selas Corp. of Am.,* 902 F.2d 703, 715 (9th Cir.1990). Given the dispositive and binding nature of the Ninth Circuit's finding, leaving no discretion to the District Court, the panel's ruling was functionally equivalent to a declaratory judgment. *Cf. Animal Lovers Volunteer Assoc.,* 867 F.2d at 1225 (declaratory judgment conferred prevailing party status).

Defendants also contend that the Ninth Circuit's finding is not dispositive because the court did not address the threshold issue of whether the USDA was required to prepare an EA for the 2000 Final Rule in the first place. Def.'s Response 18:21–24. However, the Ninth Circuit implicitly and necessarily rejected the argument in finding the NEPA violation. If an EA were in fact not required at all, there would be no violation based on the lack of opportunity to comment on the EA. Moreover, as Citizens point out (without dispute by Defendants), Defendants raised this argument before Judge Jenkins and on the appeal to the Ninth Circuit, to no avail.

Finally, the fact that the Ninth Circuit's finding of a NEPA violation did not lead to an actual entry of a formal declaratory

5. Defendants point to the Ninth Circuit's conclusion that "we do not reach the merits of Citizens' appeal on their motion for injunctive relief, however, because the district court did not reach the merits of the motion." 341 F.3d at 978. However, that conclusion does not gainsay the Ninth Circuit's finding of a NEPA violation. The panel did not reach the merits of the ESA claim and thus the scope of any injunction could have been open to the District Court. Moreover, even though the panel found a violation on the merits of a NEPA claim, there could be other reasons to deny or narrow injunctive relief. Thus, while the finding of a NEPA violation was clearly made, the scope of any injunctive relief was open.

judgment by the District Court does not undermine Citizens' prevailing party status. A final formal judgment is not necessary. As noted above, even a preliminary injunction without a final judgment can effect a material change in the parties' relationship. *Watson,* 300 F.3d at 1096. Given the dispositive and binding nature of the Ninth Circuit's decision herein, entry by the District Court of a declaratory judgment on the NEPA claim would have been ministerial. To deny prevailing party status to the Plaintiffs simply because the absence of the lower court's perfunctory implementation of the Ninth Circuit's ruling would exalt form over substance.[6] The ultimate question is whether the Ninth Circuit's ruling was a ruling on the merits which altered the parties legal relationship. It was.

b. *"Substantially Justified"*

The USDA's threshold position is that it "was not required to prepare an EA ... because the agency's Planning Rules can have no significant impact on the environment." Def.'s Resp. at 18:21–24. The USDA claims that the Rules are too remote to cause any significant impact. Def.'s Opp. to Pl.'s Mot. for S.J. at 18. Alternatively, the USDA argues that even if an EA was required, there was no clear requirement that an EA be circulated for public comment. Def.'s Resp. at 21:6–14.

The USDA's position fails to comprehend the role of an EA. A full EIS is required for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); *see Dept. of Transp. v. Pub. Citizen,* 541 U.S. 752, 757, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004). However, if the agency is not certain that an EIS is necessary, and the agency's proposed action is neither categorically excluded from the requirement to produce an EIS nor would clearly require an EIS, an EA must be prepared. *Public Citizen,* 541 U.S. at 757, 124 S.Ct. 2204 (citing 40 C.F.R. §§ 1501.4(a) and (b)); *see Native Ecosystems Council v. U.S. Forest Serv.,* 428 F.3d 1233, 1238–39 (9th Cir.2005) ("NEPA's implementing regulations provide that an agency shall prepare an EA to determine whether a proposed federal action will have a significant impact and to determine whether preparation of an EIS will be necessary."). As explained below, the Planning Rules constituted a "major Federal action" and presented a risk of affecting the quality of the environment sufficient to require at least an EA.

i. *NEPA Requires the Preparation of an EA for Major Federal Actions*

The Planning Rules constituted a "major Federal action," defined by the regulations to include "[a]doption of official policy such as rules, regulations, and interpretations" and "formal documents establishing an agency's policies which will result in or substantially alter agency programs." 40 C.F.R. § 1508.18(b)(1). Major action also include "formal plans ... which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based." *Id.* at 1508.18(b)(2). The USDA itself described the Planning Rules as "regulations regarding the process for the development and revision of land man-

6. Although the district court in *In re Application of Mgndichian,* 312 F.Supp.2d 1250, 1256–58 (C.D.Cal.2003), analyzed whether a final judgment had been entered pursuant to Fed.R.Civ.P. 58, in determining eligibility for fees, the court provided no analysis why a formal final judgment was a necessary predicate to a fee award. In any event, the entry of judgment appears to have been important there in order to insure finality of the court's ruling, finality necessary to finding a material alteration in the parties' relationship. Here, the Ninth Circuit's finding of a NEPA violation was undoubtedly a final decision of that court.

agement plans." The USDA does not seriously dispute the Planning Rules constitute major Federal action. Rather, the USDA contends that the Planning Rules "can have no significant impact on the environment"[7] because the Rules do not "authorize any ground-disturbing activities or direct changes to the environmental status quo."[8]

ii. *The USDA's Reasoning that the Planning Rules are too Remote has Long Been Rejected by the Ninth Circuit*

The USDA essentially rehashes its earlier argument that there is an insufficient connection between the Planning Rules and any subsequent impact to the environment because the Rules are too removed. Def.'s Resp. at 19. However, the Ninth Circuit in this case rejected (in the context of standing), the core of the USDA's argument, relying on an established line of cases in doing so. *Citizens,* 341 F.3d at 973–975 (citing, *e.g. Idaho Conservation League v. Mumma,* 956 F.2d 1508, (9th Cir.1992)).

In *Idaho Conservation League,* plaintiffs alleged that a Forest Service LRMP and accompanying EIS violated NEPA. 956 F.2d at 1512. The Forest Service argued that "the effect of the challenged action is too remote to sustain standing." *Id.* at 1515. However, the court determined that because the plans "represent[ed] important decisions," plaintiffs' procedural injuries under NEPA were immediate and standing was satisfied. *Id.* at 1516. The fact that the challenged action was a step removed from the authorization of site-specific development was not dispositive. The court found that despite "the fact that [any] concrete effect might be seriously mitigated at the site-specific, project level, the initial plan and wilderness recommendation represent important decisions." 956 F.2d at 1516. The Ninth Circuit has reaffirmed this analysis in several subsequent cases where plaintiffs have challenged Forest Service plans. *See Salmon River Concerned Citizens v. Robertson,* 32 F.3d 1346, 1355 (9th Cir.1994) (reaffirming the holding in *Idaho Conservation* that "plaintiffs need not wait to challenge a specific project when their grievance is with an overall plan"); *Resources Ltd. v. Robertson,* 35 F.3d 1300, 1303 (9th Cir. 1993) (same).

Federal action may "significantly affect[ ]" the quality of the environment directly or indirectly. 40 C.F.R. §§ 1508.8(a) and (b). Indirect effects "are caused by the action and are later in time or father removed in distance, but are still readily foreseeable." *Id.* at 1508.8(a). The purpose of an EA is to make a factual determination whether there is sufficient risk to the environment which would warrant a full EIS. *See* 40 C.F.R. §§ 1501.4(a)-(b); *LaFlamme v. Federal Energy Regulatory Comm.,* 852 F.2d 389, 399 (9th Cir.1988) (agency erred in failing to prepare EA or FONSI). The applicability of NEPA turns on the magnitude of the probable effects, not the specific level of regulation at issue.

Thus, for instance, NEPA clearly applies to the promulgation of LRMPs, which is only one regulatory step removed from the Planning Rules. *See e.g. Earth Island Inst. v. U.S. Forest Serv.,* 442 F.3d 1147, 1154 (9th Cir.2006). As the Ninth Circuit held herein, the fact that the probable environmental impact ensues from regulations two levels removed from site-specific action does not preclude NEPA's applicability.

An examination of the three-tiered regulatory system for the management of

7. Def.'s Resp. to Mot. for Attorney's Fees at 18.

8. Def.'s Opp. to Pl.'s Mot. for SJ at 18.

> national forests and grasslands reveals that when the [Planning Rules are] implemented, harm to Citizens' concrete interests is reasonably probable. Even components of the 2000 Rule that apply indirectly to site-specific plans will (with reasonable probability) influence for the worse the environmental safeguards in LRMPs promulgated thereunder, which in turn will likely result in less environmental safeguards at the site-specific plan level.

*Citizens,* 341 F.3d at 966.

In reviewing the agency's action, the court applies "the less deferential standard of 'reasonableness' ... to threshhold agency decisions that certain activities are not subject to NEPA's procedures." *Northcoast Env. Center v. Glickman,* 136 F.3d 660, 667 (9th Cir.1998). As demonstrated by the Ninth Circuit's decision herein, as well as prior Ninth Circuit precedent and applicable regulations, the USDA's argument that the Planning Rules could have no significant impact on the environment (thus relieving it of the obligation to conduct an EA) was not substantially justified.[9]

iii. *The USDA's Reliance on Northcoast is Misplaced*

The USDA argues that the Ninth Circuit's decision in *Northcoast* supports its position that NEPA compliance was not required for the Planning Rules. However, *Northcoast* supports only the narrow proposition that when an agency promulgates guidelines that are not concrete enough to be considered "action," NEPA compliance is not required. 136 F.3d at 670. In *Northcoast,* plaintiffs alleged that government agencies violated NEPA by failing to prepare either an EA or EIS for an inter-agency management plan. *Id.* at 662. However, the management plan merely directed continuous refinement of the risk assessment model, development of management strategies and development of a system for sharing information, setting forth goals rather than concrete directives to be considered while developing future strategies and procedures. *Id.* at 668. The Ninth Circuit thus held that the documents were "merely research, development, and information-gathering tools intended to lay the groundwork for later decision making." *Id.* at 667. Such broad strategies and goals were not sufficiently concrete to properly be considered "action." *Id.* at 667, 670.

The Planning Rules' concrete requirements are clearly distinguishable from the aspirational goals of the management plan in *Northcoast.* The Planning Rules are "[n]ational uniform regulations" which "govern the development and revision of the regional and local plans." *Id.* (citing 16 U.S.C. § 1604(g)). As the Ninth Circuit has already noted, the Planning Rules' specific directives "substantially modified the 1982 Rule in a number of ways." *Citizens,* 341 F.3d at 967; *see supra* Section II(B). The court found that "the 2000 Plan Development Rule decrease[d] substantive environmental requirements (thus injuring [Plaintiffs'] concrete interest in enjoying the national forests) as compared to the 1982 Plan Development Rule." *Id.* at 972.[10]

9. Indeed, the USDA's past conduct demonstrates it previously understood NEPA applies. The initial 1979 Planning Rules were accompanied by a full EIS. When the Forest Service prepared the 1982 revisions, they were accompanied by an EA which stated that "[t]his combined environmental assessment and report is intended to meet all requirements for compliance with the National Environmental Policy Act." 47 Fed.Reg. 7678, 7694 (Feb. 22, 1982).

10. Where a nation-wide plan or regulation has a concrete environmental impact, *Kleppe*

iv. *The USDA's Alternate Position was Not Substantially Justified*

Finally, the USDA contends that its position on the level of public comment for an EA was substantially justified because there was no clear requirement that some degree of comment was required. Def.'s Resp. at 21. While the Ninth Circuit acknowledged that an EA need not conform with all the NEPA requirements and that the court had "not established a minimum level of public comment and participation required by the regulations governing the EA and FONSI process, we [the Ninth Circuit] clearly have held that the regulations at issue must mean something."

> It is evident, therefore, that a complete failure to involve or even inform the public about an agency's preparation of an EA and a FONSI, as was the case here, violates these regulations. This wholesale neglect of the regulations' mandatory inclusion of the public in the process results in a procedural injury. Moreover, it undermines the very purpose of NEPA, which is to "ensure[] that federal agencies are informed of environmental consequences before making decisions and that the information is available to the public." *Okanogan Highlands Alliance v. Williams,* 236 F.3d 468, 473 (9th Cir.2000).

341 F.3d at 970. The Ninth Circuit thus made it clear that the "wholesale neglect of the regulations" found here clearly established a NEPA violation. Thus, the USDA has not shown that its position was "substantially justified."

c. *Reasonableness of Attorneys' Fees*

As indicated in Section B of this order, the Court grants attorneys' fees pursuant only to Plaintiffs' victory under the NEPA claim. Since Plaintiffs have briefed only the issue of attorneys' fees for *both* procedural NEPA and ESA claims, it is premature for the Court to undertake the reasonableness analysis. Instead, Plaintiffs are ordered to file a supplemental brief and supporting evidence of attorneys' fees and costs attributable to the NEPA claim.

B. *Endangered Species Act and "Catalyst Theory"*

1. *Legal Standard*

a. *Applicability of Ruckelhaus and Buckhannon*

The Endangered Species Act states that "any person may commence a civil suit on his own behalf ... against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section [1533 of this title] which is not discretionary with the Secretary." 16 U.S.C. § 1540(g)(1)(C). The Act further provides that, in issuing any final order in any suit brought pursuant to the citizen suit provision of the ESA, the court "may award costs of litigation (including reasonable attorney and expert witness fees) to any party, *whenever the court determines such award is appropriate.*" 16 U.S.C. § 1540(g)(4) (emphasis added). This language was "meant to expand the class of parties eligible for fee awards from prevailing parties to *partially prevailing* parties-parties achieving *some success,* even if not major success." *Assoc. of Cal. Water Agencies v. Evans,* 386 F.3d 879, 884 (9th Cir.2004) (citing *Ruckelshaus v. Sierra Club,* 463 U.S. 680, 688, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983)) (emphasis in original).[11] In light of this statutory language,

v. Sierra Club *directs that compliance with NEPA is required. 427 U.S. 390, 399–400, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).*

11. Although the Supreme Court in *Ruckelshaus* was construing language in the Clean Water Act, it was clear that its analysis applied to identical language in other acts, including that of the Endangered Species Act. *Id.* (citing *Ruckelshaus,* 463 U.S. at 682 n. 1, 103 S.Ct. 3274).

the courts have permitted employment of the "catalyst theory" where the lawsuit brought about a voluntary change in the defendant's conduct even after *Buckhannon* which held the catalyst theory inapplicable to the Fair Housing Amendment Act and Americans with Disabilities Act. *Id.* (citing *Buckhannon,* 532 U.S. at 601, 121 S.Ct. 1835).

Thus, *Buckhannon,* which involved fee shifting statutes with "prevailing party" language, does not apply to statutes such as the ESA which utilize the "whenever ... appropriate" language. In *Assoc. of Cal. Water Agencies,* the Ninth Circuit agreed with the Eleventh Circuit and held that *Buckhannon* did not preclude the use of the catalyst theory for suits brought under the ESA. *See id.* at 885; *Southwest Ctr. for Biological Diversity v. Carroll,* 182 F.Supp.2d 944, 948 (C.D.Cal.2001) (holding that, in the absence of Supreme Court or Ninth Circuit precedent overruling the catalyst theory in the context of the ESA, it is appropriate for the court to exercise discretion under 1540(g)(4) to determine whether an attorney's fees is appropriate). Defendants do not take issue with this conclusion.

b. *Plaintiffs' Entitlement to an Award of Fees*

When a plaintiff does not win a final judgment on the merits, a two-part test determines whether that plaintiff nonetheless "prevailed" for the purpose of receiving attorney's fees under the catalyst theory:

> First, in a factual inquiry, the District Court must determine what the lawsuit sought to accomplish and then determine whether it was accomplished by means of the suit. Plaintiffs need only have received some of the benefits they sought in the suit. There must, however, be some sort of clear, *causal relationship* between the litigation brought and the practical outcome realized....
>
> In the second part of the two-part test, the legal inquiry, the court must determine that the benefit achieved was required by law and was not a gratuitous act of the defendant.

*Assoc. of Cal. Water Agencies,* 386 F.3d at 885–86, n. 3 (citing *Greater L.A. Council on Deafness v. Community Television of So. Cal.,* 813 F.2d 217, 219–20 (9th Cir. 1987)) (emphasis in original). As to the second point, "[i]f it has been judicially determined that defendants' conduct, however beneficial it may be to plaintiff's interests, is not required by law, then defendants must have acted gratuitously and plaintiffs have not prevailed in a legal sense." *Sablan v. Dept. of Finance of Commonwealth of N. Mariana Islands,* 856 F.2d 1317, 1327 (9th Cir.1988) (quoting *Cal. Ass'n of Physically Handicapped, Inc. v. FCC,* 721 F.2d 667, 672 (9th Cir. 1983)). "For the purposes of determining entitlement to fees, a claim has a basis in law so long as it is not 'frivolous, unreasonable, or groundless.'" *Stivers,* 71 F.3d at 752 (quoting *Sablan,* 856 F.2d at 1327).

2. *No Causal Relationship*

Plaintiffs argue that they have prevailed under the catalyst theory since their overall litigation, which included substantive and procedural claims under various federal statutes, played a "catalytic role" in Defendants' decision to suspend, review, and ultimately remove the 2000 Final Rule. Pl.'s Memo. 8:16–18. The Court assumes this is true, given the repeated acknowledgment by the USDA in *e.g.,* the Larson Report and in its decision to revise the 2000 Final Rule, that this and other litigation were considered causative factors by the USDA. Indeed, Defendants do not appear to dispute this proposition.

Instead, Defendants counter that the "catalyst theory" applies here only to the EA claim but not the other causes of action, and that therefore Plaintiffs must

show their procedural ESA claim alone played a catalytic role in Defendant's decision to remove the 2000 Final Rule. *See* Def.'s Response 10:22–27, 11:1–2. Plaintiffs contend, on the other hand, it is enough to show that the overall litigation was a causal factor. They cite to case law in support (Pl.'s Reply 4:24–26, 5:1–6), but their citations are inapposite because all the cases are either pre-*Buckhannon* (so that all the claims in the lawsuit were eligible for the "catalyst theory") or post-*Buckhannon* litigation that involved only claims under the ESA. *See id.* None involve the situation where, as here, there is a mix of claims, only one of which is eligible for catalyst treatment.

Under *Buckhannon,* claims ineligible for catalyst treatment cannot be considered a causative factor. Although there appears to be no post-*Buckhannon* cases on point, the Court concludes that the logic of *Buckhannon* requires that the plaintiff must show that the claim or claims still eligible for catalyst treatment were the causative factor in changing the defendants' conduct.

The question then is who bears the burden of proof in mixed claims cases. Normally, the plaintiff bears the burden of proving that its litigation played a catalytic role in defendants' decision to alter its behavior. *See e.g. Goehring v. Brophy,* 94 F.3d 1294, 1304 (9th Cir.1996) (plaintiff has the burden of proof under the catalyst theory). However, where the litigation involves several claims some which do and others which do not qualify for catalyst treatment, there is a good reason to shift the burden of proof. The burden of proving that a particular claim motivated the defendants' behavior is more onerous than proving a lawsuit as a whole was a causative factor. Moreover, defendant has greater access to evidence of its motivation. *U.S. v. 194 Quaker Farms Rd.,* 85 F.3d 985, 990 (2nd Cir.1996) ("Burden-shifting where one party has superior access to evidence on a particular issue is a common feature of our law."); *U.S. v. Continental Ins. Co.,* 776 F.2d 962, 964 (11th Cir.1985) (following "common law guide that the party in the best position to present the requisite evidence should bear the burden of proof"); *Medina v. California,* 505 U.S. 437, 455, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992) (O'Connor, J., concurring) (whether the government has superior access to evidence is a relevant consideration in determining whether placement of the burden of proof is unfair). *See generally* 9 Wigmore, Evidence § 2486 (Chadbourn rev.1981). Accordingly, once the plaintiff proves the litigation as a whole was a catalytic factor, the burden of proof shifts to the defendant to show its behavior would have been the same even if the ESA (or similar claim to which the catalyst theory applies) claim had not been a part of the litigation. *Cf. Price Waterhouse v. Hopkins,* 490 U.S. 228, 244–45, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (once plaintiff shows gender played a motivating part in an employment decision, defendant may avoid damages liability by proving it would have made decision even if it had not allowed gender to play such a role); *Mt. Healthy City School Dist. Bd. of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (where plaintiff proves constitutionally protected conduct played a substantial part in decision not to rehire employee, burden shifts to defendant to show it would have reached the same decision even in the absence of such protected conduct).

As noted above, Citizens has shown that the litigation played a causative role in the USDA's decision to review and withdraw the 2000 Final Rule. Plaintiffs point to the Larson Report and the Federal Register notice that contained comments made by the USDA for a 2002 proposed rule wherein the USDA acknowledged the overall

litigation was a causative factor which led to the suspension and review of the 2000 Final Rule.

The question is whether Defendants have demonstrated the USDA would have taken the same action even if the Plaintiffs' lawsuit had not contained the ESA claim. The Court finds they have. As Defendants note, the Federal Register notice and the Larson Report alluded to *substantive* evaluations of the Rule's "implementability" which addressed Plaintiffs' NFMA claims. The Larson Report only mentions the alleged violation of the NFMA. Pl.'s Memo., Exh. A at 3. The "Topics of Major Concern" listed in the Report addresses only substantive issues such as "sustainabilty," "viability," and "monitoring." *Id.* at 5–16. None of the documents say anything about Plaintiffs' procedural ESA claim and the alleged failure to consult with expert agencies. Indeed, in promulgating the ultimate 2005 Planning Rule, the Forest Service reiterated its rejection of the ESA consultation claim, stating "[t]he final rule is not an action having a direct effect on threatened or endangered species [and therefore] no consultation is required as part of the final rules' development." 70 Fed.Reg. at 1035.

Thus, Defendants have proved the procedural ESA claim did not play a "catalytic role" in bringing about the desired result. Fees cannot be awarded in this claim.

## IV. *RECOMMENDATION*

For the aforementioned reasons, this Court recommends that Plaintiffs' motion for attorneys' fees and costs be granted pursuant only to the NEPA claim. This Court orders that Plaintiffs shall by August 2, 2006 submit a supplemental brief and supporting evidence on attorneys' fees and costs attributable to the NEPA claim. Defendants shall submit any responsive papers by August 16, 2006. The matter will then be taken under submission.

Any party may file objections to this report and recommendation with the district judge within ten days after being served with a copy. *See* 28 U.S.C. § 636(b)(1)(B); Fed.R.Civ.P. 72(b); Civil L.R. 72–3.