**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IN RE BIG THORNE PROJECT AND 2008 TONGASS FOREST PLAN, | No. 15-35232 |
| | D.C. Nos. 1:14-cv-00013-RRB 1:14-cv-00014-RRB 1:14-cv-00015-RRB |
| SOUTHEAST ALASKA CONSERVATION COUNCIL; ALASKA WILDERNESS LEAGUE; SIERRA CLUB; NATIONAL AUDUBON SOCIETY; NATURAL RESOURCES DEFENSE COUNCIL, *Plaintiffs-Appellants*, | |
| and | |
| CASCADIA WILDLANDS; GREATER SOUTHEAST ALASKA CONSERVATION COMMUNITY; GREENPEACE; CENTER FOR BIOLOGICAL DIVERSITY; THE BOAT COMPANY, *Plaintiffs*, | |
| v. | |

UNITED STATES FOREST
SERVICE; UNITED STATES
DEPARTMENT OF
AGRICULTURE; BETH
PENDLETON, in her official
capacity as United States
Forest Service Region 10
Regional Forester; FORREST
COLE, in his official capacity
as Forest Supervisor for the
Tongass National Forest;
THOMAS TIDWELL, in his
official capacity as Chief of
the United States Forest
Service,

       *Defendants-Appellees*,

STATE OF ALASKA; ALASKA
FOREST ASSOCIATION, INC.;
SOUTHEAST CONFERENCE;
VIKING LUMBER COMPANY,
INC.; CITY OF CRAIG; ICY
STRAITS LUMBER CO. INC.;
SOUTHEAST STEVEDORING
CORPORATION; ALASKA
ELECTRIC LIGHT AND POWER
COMPANY; ALASKA POWER &
TELEPHONE; ALASKA
MARINE LINES, INC.; ALASKA
MINERS ASSOCIATION; FIRST
THINGS FIRST FOUNDATION;
SAMSON TUG AND BARGE
COMPANY, INC.; TYLER

RENTAL, INC.; RESOURCE
DEVELOPMENT COUNCIL OF
ALASKA, INC.; SOUTHEAST
ROADBUILDERS, INC.; BOYER
TOWING, INC.; CITY OF
KETCHIKAN; KETCHIKAN
GATEWAY BOROUGH; CITY
AND BOROUGH OF
WRANGELL; FEDERAL
FOREST RESOURCE
COALITION; FIRST BANK,
*Intervenor-Defendants-*
*Appellees*.

IN RE BIG THORNE PROJECT
AND 2008 TONGASS FOREST
PLAN,

SOUTHEAST ALASKA
CONSERVATION COUNCIL;
ALASKA WILDERNESS
LEAGUE; SIERRA CLUB;
NATIONAL AUDUBON
SOCIETY; NATURAL
RESOURCES DEFENSE
COUNCIL,
*Plaintiffs*,

and

CASCADIA WILDLANDS;

No. 15-35233

D.C. Nos.
1:14-cv-00013-RRB
1:14-cv-00014-RRB
1:14-cv-00015-RRB

GREATER SOUTHEAST
ALASKA CONSERVATION
COMMUNITY; GREENPEACE;
CENTER FOR BIOLOGICAL
DIVERSITY; THE BOAT
COMPANY,
          *Plaintiffs-Appellants*,


                    v.


UNITED STATES FOREST
SERVICE; UNITED STATES
DEPARTMENT OF
AGRICULTURE; BETH
PENDLETON, in her official
capacity as United States
Forest Service Region 10
Regional Forester; FORREST
COLE, in his official capacity
as Forest Supervisor for the
Tongass National Forest;
THOMAS TIDWELL, in his
official capacity as Chief of
the United States Forest
Service,
          *Defendants-Appellees*,


STATE OF ALASKA; ALASKA
FOREST ASSOCIATION, INC.;
SOUTHEAST CONFERENCE;
VIKING LUMBER COMPANY,
INC.; CITY OF CRAIG; ICY
STRAITS LUMBER CO. INC.;

SOUTHEAST STEVEDORING CORPORATION; ALASKA ELECTRIC LIGHT AND POWER COMPANY; ALASKA POWER & TELEPHONE; ALASKA MARINE LINES, INC.; ALASKA MINERS ASSOCIATION; FIRST THINGS FIRST FOUNDATION; SAMSON TUG AND BARGE COMPANY, INC.; TYLER RENTAL, INC.; RESOURCE DEVELOPMENT COUNCIL OF ALASKA, INC.; SOUTHEAST ROADBUILDERS, INC.; BOYER TOWING, INC.; CITY OF KETCHIKAN; KETCHIKAN GATEWAY BOROUGH; CITY AND BOROUGH OF WRANGELL; FEDERAL FOREST RESOURCE COALITION; FIRST BANK,

*Intervenor-Defendants-Appellees.*

IN RE  BIG THORNE PROJECT
AND 2008 TONGASS FOREST
PLAN,

SOUTHEAST ALASKA
CONSERVATION COUNCIL;
ALASKA WILDERNESS
LEAGUE; SIERRA CLUB;
NATURAL RESOURCES
DEFENSE COUNCIL,
          *Plaintiffs-Appellants*,

v.

UNITED STATES FOREST
SERVICE; UNITED STATES
DEPARTMENT OF
AGRICULTURE; BETH
PENDLETON, in her official
capacity as United States
Forest Service Region 10
Regional Forester; FORREST
COLE, in his official capacity
as Forest Supervisor for the
Tongass National Forest;
THOMAS TIDWELL, in his
official capacity as Chief of
the United States Forest
Service,
          *Defendants-Appellees*,

No. 15-35244

D.C. Nos.
1:14-cv-00014-RRB
1:14-cv-00013-RRB
1:14-cv-00015-RRB


OPINION

STATE OF ALASKA; ALASKA FOREST ASSOCIATION, INC.; SOUTHEAST CONFERENCE; VIKING LUMBER COMPANY, INC.; CITY OF CRAIG; ICY STRAITS LUMBER CO. INC.; SOUTHEAST STEVEDORING CORPORATION; ALASKA ELECTRIC LIGHT AND POWER COMPANY; ALASKA POWER & TELEPHONE; ALASKA MARINE LINES, INC.; ALASKA MINERS ASSOCIATION; FIRST THINGS FIRST FOUNDATION; SAMSON TUG AND BARGE COMPANY, INC.; TYLER RENTAL, INC.; RESOURCE DEVELOPMENT COUNCIL OF ALASKA, INC.; SOUTHEAST ROADBUILDERS, INC.; BOYER TOWING, INC.; CITY OF KETCHIKAN; KETCHIKAN GATEWAY BOROUGH; CITY AND BOROUGH OF WRANGELL; FEDERAL FOREST RESOURCE COALITION; FIRST BANK,

*Intervenor-Defendants-Appellees.*

Appeal from the United States District Court
for the District of Alaska
Ralph R. Beistline, Senior District Judge, Presiding

Argued and Submitted February 3, 2016
Seattle, Washington

Filed May 23, 2017

Before: Alex Kozinski, Diarmuid F. O'Scannlain
and Ronald M. Gould, Circuit Judges.

Opinion by Judge Kozinski;
Dissent by Judge Gould

## SUMMARY[*]

### National Forest Management Act

The panel affirmed the district court's summary judgment
in favor of the United States in an action alleging that the
United States Forest Service violated the National Forest
Management Act by approving either the Big Thorne logging
project or the 2008 Tongass Forest Plan under which Big
Thorne was authorized.

Plaintiffs alleged that the 2008 Tongass Forest Plan
unlawfully damages the habitat of the indigenous Alexander
Archipelago wolf, and that the Forest Service violated its self-

---

[*] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

imposed obligation under the Plan by failing to ensure the wolf's sustainability. The panel held that the Plan's provision pertaining to sustainability was discretionary. The panel held that because the Forest Service was only obligated to consider sustainability "where possible," there was no law to apply in second-guessing the agency. The panel held that it was aware of no authority compelling the agency to set a specific standard or benchmark for protecting the viability of a species that was neither endangered nor threatened. The panel noted that the Forest Service's Record of Decision specifically concluded that the Forest Plan would "sustain viable populations of the Alexander Archipelago wolf," and the panel concluded that Forest Service's discussion of viability wasn't arbitrary or capricious. The panel further held that the Big Thorne Project was consistent with the Forest Plan.

In a concurrently filed memorandum disposition, the panel also dismissed plaintiffs' claims under the National Environmental Policy Act.

Judge Gould dissented from the portion of the majority's discussion of the issues relating to the National Forest Management Act, and concurred in the court's reasoning concerning the National Environmental Policy Act, as presented in the concurrently filed memorandum disposition. Judge Gould stated that the Forest Plan presently provides no mechanism to ensure wolf population viability, and that the agency's rationale and reasoning process was too summary and conclusory. Judge Gould would vacate the decision of the Forest Service and remand for further proceedings, which at a minimum would include both a thorough assessment of the viability of the Alexander Archipelago wolf if the project proceeds, and an explanation of its reasoning

sufficient to satisfy *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## COUNSEL

Holly Anne Harris (argued), Thomas S. Waldo, and Eric P. Jorgensen, Earthjustice, Juneau, Alaska, for Plaintiffs-Appellants/Plaintiffs.

Christopher Winter (argued), Ralph Bloemers, and Oliver Stiefel, Crag Law Center, Portland, Oregon; Gabriel Scott, Cordova, Alaska; for Plaintiffs/Plaintiffs-Appellants.

Allen M. Brabender (argued), Emily Polachek, and David Glazer, Attorneys; John C. Cruden, Assistant Attorney General; Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.; James Ustasiewski and Kate Baldridge, Office of General Counsel, United States Department of Agriculture; for Defendants-Appellees.

Richard Goeken (argued), Smith Currie & Hancock LLP, Washington, D.C.; Thomas E. Lenhart (argued), Senior Assistant Attorney General; Craig W. Richards, Attorney General; Office of the Attorney General, Juneau, Alaska; Julie A. Weis, Haglund Kelley LLP, Portland, Oregon; James F. Clark, Law Offices of James F. Clark, Juneau, Alaska; Steven W. Silver, Robertson Monagle and Eastaugh, Reston, Virginia; for Intervenor-Defendants-Appellees.

## OPINION

KOZINSKI, Circuit Judge:

Big Thorne is a logging project in Alaska's Tongass National Forest. The United States Forest Service approved the logging to help revive the lackluster economy of southeastern Alaska. But the project has been met with howls of protest from the plaintiffs in this case, who claim that Big Thorne unlawfully damages the habitat of an indigenous wolf. The district court dismissed all challenges, and we must now decide whether the Forest Service violated the National Forest Management Act (NFMA) by approving either the Big Thorne project or the 2008 Tongass Forest Plan (Forest Plan) under which Big Thorne was authorized.

## FACTS

Big Thorne allows timber to be harvested from Alaska's Prince of Wales Island. The island, which is the size of Delaware, is the largest in a chain that makes up Alaska's Alexander Archipelago. Like most of the archipelago, Prince of Wales Island is covered in old-growth rainforest. Big Thorne authorizes logging on nearly 6,200 acres and the construction of more than 80 miles of roads.

Logging and road construction will trench on the habitat of the Alexander Archipelago wolf. This rare wolf preys on a species of deer that thrives in the old-growth rainforest, which provides suitable shelter and forage during periods of heavy snow. A smaller forest will support fewer deer, which, in turn, will support fewer wolves. The new roads will compound that effect by letting wolf and deer hunters range deeper into the forest.

Concerns about the fate of the wolf are not new. This discrete and insular canine is confined to the islands of the archipelago and surrounding coastline, and is thus sensitive to changes in local habitat. In 1993, environmental groups petitioned to have the wolf listed under the Endangered Species Act. The Fish and Wildlife Service denied the petition,[1] but nonetheless helped convene a team of scientists to prepare a "wolf conservation assessment." The assessment recommended that the wolf be protected by maintaining the deer population and limiting road density.

The Forest Service used these recommendations in 2008 as the basis for two "standards and guidelines" adopted in the Forest Plan. The first of these—known as the "wolf provision"—encourages the Forest Service to "[p]rovide, *where possible*, sufficient deer habitat capability to . . . maintain sustainable wolf populations" (emphasis added). A sufficient habitat capability "is generally considered to equate to . . . 18 deer per square mile." The second guideline—the "road provision"—provides that "[t]otal road densities of 0.7 to 1.0 mile per square mile or less *may be* necessary" to protect the wolves (emphasis added).

Even before Big Thorne was approved, the project area had insufficient habitat capability to support 18 deer per square mile, and road densities were above the recommended

---

[1] In response to several renewed petitions, the Fish and Wildlife Service concluded in early 2016 that "listing the Alexander Archipelago wolf is not warranted at this time throughout all or a significant portion of its range, including [Prince of Wales Island]." 12-Month Finding on a Petition To List the Alexander Archipelago Wolf as an Endangered or Threatened Species, 81 Fed. Reg. 435, 435 (Jan. 6, 2016).

maximum. The logging project will further reduce deer habitat capability and increase road density.

The Forest Service nevertheless put the welfare of local loggers and their families above that of the wolves, and approved Big Thorne. More concerned with wolves than jobs, plaintiffs filed three lawsuits, pressing a variety of challenges in an attempt to derail the project. The district court consolidated the cases and granted Alaska's motion to intervene. It then granted summary judgment to the defendants on all claims. Plaintiffs appeal.

## DISCUSSION

We consider whether the Forest Service violated the NFMA by approving the Forest Plan or the Big Thorne logging project.[2] This dual inquiry tracks the two tiers of the agency's legal obligations. First, the NFMA requires that the Forest Service develop "land and resource management plans," commonly called forest plans, that set broad goals and guidelines for each national forest. 16 U.S.C. § 1604(a), (e), (g); *Citizens for Better Forestry* v. *U.S. Dep't of Agric.*, 341 F.3d 961, 966 (9th Cir. 2003). Second, after a forest plan is developed, all subsequent agency actions within that national forest—projects like Big Thorne—must comply with both the NFMA and the relevant forest plan. 16 U.S.C. § 1604(i); *see also Lands Council* v. *McNair*, 537 F.3d 981, 989 (9th Cir. 2008) (en banc), *abrogated in part on other*

---

[2] The district court also dismissed plaintiffs' claims brought under the National Environmental Policy Act. We dispose of those claims, and several outstanding motions for judicial notice, in a memorandum disposition filed concurrently.

*grounds by Winter* v. *Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008).

The Administrative Procedure Act provides our standard of review. We set aside an agency's actions "only if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Or. Nat. Res. Council Fund* v. *Goodman*, 505 F.3d 884, 889 (9th Cir. 2007) (internal quotation marks omitted) (discussing 5 U.S.C. § 706(2)(A)).

## A. The Forest Plan

**1.** While "generalized harm" to the environment isn't enough to supply standing, the Supreme Court has emphasized that particularized harm to "recreational" or even "mere esthetic interests" *is* sufficient. *Summers* v. *Earth Island Inst.*, 555 U.S. 488, 494 (2009). We have previously held that a plaintiff has standing to challenge a "programmatic" agency decision (like a forest plan) when he suffers harm that is "fairly traceable" to that program. *See Cottonwood Envtl. Law Ctr.* v. *U.S. Forest Serv.*, 789 F.3d 1075, 1081 (9th Cir. 2015) (internal quotation marks omitted).

Plaintiffs present voluminous declarations amply demonstrating that they are challenging the Forest Plan as a result of specific applications and not, as defendants claim, on its face. The declarants use sites affected by the Forest Plan for fishing, hunting, and to "enjoy the solitude" available only in "remote, undeveloped areas on the Tongass." Unlike the single individual affidavit before the Supreme Court in *Summers*, 555 U.S. at 495—which was inadequate to establish standing—these declarations are sufficient to show

that actions approved under the Forest Plan will cause particularized injury to the plaintiffs.

**2.** The NFMA's regulations at the time of the Forest Plan required that national forests "be managed to maintain *viable* populations of existing native and desired non-native vertebrate species." 36 C.F.R. § 219.19 (2000) (emphasis added).[3] This regulation defined a viable population as one with enough "reproductive individuals to insure its continued existence is well distributed in the planning area." *Id.* So our question is whether the Forest Service unlawfully concluded that its Forest Plan would safeguard the continued and well-distributed existence of the Alexander Archipelago wolf.

Some plaintiffs argue that this is the wrong question. They claim that the "wolf provision" of the Forest Plan in fact mandates a "sustainable" wolf population, not merely a viable one. Sustainability is the more demanding standard, and plaintiffs claim that the Forest Service violated its self-imposed obligation by failing to ensure sustainability.

The difference between sustainability and viability is not sharply defined, and is made fuzzier still by the parties, who occasionally conflate the two—as when they refer to

---

[3] This regulation has been superseded. We apply a superseded regulation "only to the extent" it was incorporated into the relevant Forest Plan. *Ecology Ctr.* v. *Castaneda*, 574 F.3d 652, 657 (9th Cir. 2009). The Forest Plan, which has not been updated since 2008, does mention the superseded regulation, and the parties don't dispute that the old regulation applies. Applying the current regulation would not change the result because the new regulation gives Forest Service officials even more leeway to "determine whether or not the plan components . . . maintain a viable population of each species of conservation concern within the plan area." 36 C.F.R. § 219.9(b).

"sustaining viable" wolf populations, or repeatedly (if obscurely) ponder the forest's ability to "sustain wolves." We need not map the precise contours of these concepts, however, because the Forest Plan provision that mentions sustainability is discretionary: It states only that the Service "[p]rovide, *where possible*, sufficient deer habitat capability to . . . maintain sustainable wolf populations" (emphasis added). This is an aspiration, not an obligation. Because the Forest Service is only obligated to consider sustainability "where possible," there is no law for us to apply in second-guessing the agency. *See Heckler* v. *Chaney*, 470 U.S. 821, 832 (1985) (construing 5 U.S.C. § 701(a)(2)). We agree with the district court that the provision gives the Service the kind of "flexibility and discretion" that is consistent with its mission of balancing competing objectives.

Plaintiffs argue that such broad discretion must itself be a problem: If the "sustainability" provision merely expresses an aspiration, the Forest Plan must violate the NFMA by failing to provide *any* enforceable mechanism for maintaining population minimums that comply with the viability regulations. The argument appears to be that the Forest Plan must set hard viability minimums—like deer per square mile—below which the Service may not go.

This argument is neither viable nor sustainable. We're aware of no authority compelling the agency to set a specific standard or benchmark for protecting the viability of a species that is neither endangered nor threatened. This makes sense when we consider our constellation of federal statutes: The NFMA is fundamentally different from the Endangered Species Act, which has a single-minded focus on protecting species that are near extinction. Because the Alexander Archipelago wolf is not entitled to such protection—despite

the best efforts of environmental groups—its treatment is guided by the less animal-friendly NFMA.  The NFMA is about managing competing uses, none to the exclusion of others.  *See* 16 U.S.C. § 1604(e).

As the dissent notes, the Forest Plan does incorporate a superseded regulation requiring the agency to "maintain viable populations" of native vertebrate species.  *See* 36 C.F.R. § 219.19 (2000); *see also supra* note 3.  But, contrary to the dissent's suggestion, we have repeatedly and emphatically stressed that the Service is *not* required to identify a specific "mechanism" for securing viability.  We have rejected the idea that the Service "must assess population viability in terms of actual population size, population trends, or the population dynamics of other species"; even if such methods are desirable, they are flatly "not required."  *Inland Empire Pub. Lands Council* v. *U.S. Forest Serv.*, 88 F.3d 754, 761 n.8 (9th Cir. 1996).  Indeed, we are "especially" deferential "when questions of scientific methodology are involved," like how to protect viability.  *Id.* at 760.  More recently, our en banc opinion in *Lands Council* v. *McNair* again made clear that courts may not "require a particular type of proof that a project would maintain a species' population."  537 F.3d at 997.  Instead, an agency need only supply "a rational connection between the facts found and the conclusions made."  *Or. Nat. Res. Council Fund* v. *Brong*, 492 F.3d 1120, 1131 (9th Cir. 2007) (citation and quotation marks omitted).  This rational connection can be supplied with studies or models or experts—or really any legitimate evidence, so long as the agency describes a reasonable fit between its means and ends.

There's no question that the agency understood and met this obligation.    The Record of Decision specifically

concludes that the Forest Plan will "sustain viable populations of the Alexander Archipelago wolf." The Service outlined a multi-part strategy for protecting the wolf, which included "providing core habitats with low road density, maintaining wolf harvest within sustainable limits through regulations, and providing adequate deer habitat to support an abundant and stable deer population." The Service extensively discussed the management and modeling concerns of alternative forest plans, and concluded that all alternatives had between a "moderately high" and "very high" probability of protecting wolf viability. The Service's Record of Decision specifically incorporates this discussion, along with a longer discussion in the 1997 Forest Plan. Could the Service's discussion have been longer, better, or different? Perhaps. But we decline to substitute our own policy wisdom for the agency's.[4]

In short, the Service met its legal obligations, and plaintiffs' remaining challenges to the Forest Plan—a potpourri of contentions that the Service misinterpreted one thing or failed to consider another—amount to the sort of quibbling that can't overcome our deferential standard of review. *San Luis & Delta-Mendota Water Auth.* v. *Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). The Forest Service's discussion of viability wasn't arbitrary or capricious.

---

[4] The dissent's focus on population changes on Prince of Wales Island, dissent at 25–26, is puzzling for two reasons. First, the Forest Service's obligation is to protect viability in the Tongass Forest as a whole, not every slice of it—in this case, an island that is less than 10% of the total national forest. Second, the effects of the Big Thorne Project tell us nothing about whether the agency complied with its legal obligations in adopting the Forest Plan many years earlier.

The NFMA gives the Forest Service flexibility because the Service has many different goals—conservation, commerce, recreation, and so on. *See* 16 U.S.C. § 1604(e)(2); *McNair*, 537 F.3d at 993–94. The statute reflects a congressional judgment that balancing these goals calls for policy judgments—judgments that often require trade-offs among worthy objectives, such as wolves and logging jobs. Congress left such judgments to a politically responsive agency with relevant expertise. *See* 63C Am. Jur. 2d Public Lands § 86 (2016) ("[T]he proper mix of uses within an area is left to the discretion of the Forest Service."). Depending on the circumstances, lumber might be more important than wolves. And even when wolves are more important than lumber, it might be better to build fewer roads rather than allow for more deer. Courts are not well-equipped to police the substance of these judgments. Instead, we employ procedural tools: In a nutshell, the agency must rationally explain why it did what it did. *Or. Nat. Res. Council Fund*, 492 F.3d at 1125. This isn't the only way to structure a modern administrative state, and its emphasis on procedure will produce results that some despise. But we have an Administrative Procedure Act, not an Administrative Policy Act.

## B. The Big Thorne Project

Even if the Forest Service lawfully implemented the Forest Plan, it must also ensure the Big Thorne Project is consistent with that plan. 16 U.S.C. § 1604(i); *McNair*, 537 F.3d at 989.

Plaintiffs claim the Service failed to do this. But almost all of their arguments proceed from the same false premise as their objections to the Forest Plan—namely, they assume that

it's a *sustainable* population that counts, rather than a viable one. And the premise is wrong for the same reason: The sustainability provision of the Forest Plan is discretionary. The Forest Service must consider protecting sustainable populations "where possible." If the Service decides that a sustainable wolf population conflicts with other appropriate forest goals, the Service has discretion to pursue those goals instead.

And that's just what the Forest Service did. It repeatedly emphasized that it was expanding timber supply from the Tongass in the service of its multiple-use mandate. The Service also pointed out that none of Big Thorne's proposed land met the Forest Plan's suggested sustainability minimums; thus, these goals wouldn't have been met even in the *absence* of a logging plan. In the end, the Service chose jobs over wolves. We have no authority to second-guess that judgment. *See supra* p. 16.

Big Thorne's environmental impact statement does contain scattered references to both sustainability and viability. But plaintiffs are off-base in suggesting that a few scattered references to sustainability—a common term that's deployed incautiously throughout the record and briefs—can transform the Service's legal obligation, which is to protect viability alone.[5] To conclude that the Service intended to saddle itself with an extra obligation would require us to overlook the agency's numerous references to viability in the

---

[5] Once more, the Service's obligation is to protect viability in the Tongass National Forest as a whole, not in each individual Tongass project area. Plaintiffs' claims that the Service failed to explain how it would maintain wolf viability in the Big Thorne area thus, once again, misunderstand the Service's obligations.

documents approving Big Thorne—as when it concluded in its impact statement that the plan was "designed to ensure the maintenance of viable populations of all vertebrate species [in] the Tongass by means of a comprehensive approach."

Because that conclusion accurately described the Service's legal obligations and was rationally explained, the judgment below is

**AFFIRMED.**

---

GOULD, Circuit Judge, dissenting in part:

I dissent from the portion of the majority's discussion of the issues relating to the National Forest Management Act (NFMA), and concur in the court's reasoning concerning the National Environmental Policy Act (NEPA).  Hence I join in full both the judgment and the reasoning of the court as presented in the memorandum disposition filed concurrently with the published opinion.  But I regret I cannot fully join the NFMA analysis, and hence I respectfully dissent in part.

Addressing the NFMA issues, that statute explicitly serves up for agency action a catalog of potential competing uses of the forest. The agency administering NFMA, the United States Forest Service (Forest Service), is explicitly to consider managing the forests having in mind environmental considerations but also economic considerations. *See Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012) ("Forest plans are designed to manage forest resources by balancing the consideration of environmental and economic factors."); 16 U.S.C. § 1604.  One purpose of the

NFMA is to encourage conservation of natural resources in our national forests. But another purpose is to support a timber industry that can provide much needed jobs to those living in forested areas in or near our national forests.

It is obvious that once the agency makes a decision in the normal case and gives more weight, for example, to creating jobs than to protecting trees, the scope of review available for a federal court will be extremely limited under the Administrative Procedures Act. We are to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Our review under the Administrative Procedure Act of the agency's final administrative action is not generally a review of substance or policy, but rather of procedure. As is well-stated by the majority, "we have an Administrative Procedure Act, not an Administrative Policy Act."

Given that agency action in substance is likely to be upheld when proper procedures are followed, it is all the more important to look carefully at whether the decision of the agency here is procedurally sound. I conclude that it is not.

For one thing, the applicable regulation governing the content of a forest plan, states that viable populations of wildlife in the forests are to be maintained. The NFMA aims to foster diversity of plant and animal communities as part of its mission to meet multiple-use objectives. 18 U.S.C. § 1604(g)(3)(B). The NFMA itself does not say that the wolf species must be maintained at specific numbers and as previously stated, the statute sets out competing potential uses of the forest that must be balanced by the responsible federal

agency.  The majority poses the issue as a choice between wolves and jobs, but it is not so simple as that.

Although the NFMA does not require viability, the agency has a duty to ensure the viability of surrounding wildlife if it incorporates 36 C.F.R. § 219.19 (2000) into its forest plan.  *See Ecology Ctr. v. Castaneda*, 574 F.3d 652, 657 (9th Cir. 2009).  And here, the Forest Service did incorporate the regulation in its forest plan by noting that it is directed "to manage wildlife habitat to maintain viable and well distributed populations to ensure continued existence in the planning area."  By so doing, "the forest plan must comply with substantive requirements of the [NFMA] designed to ensure continued diversity of plant and animal communities and the continued viability of wildlife in the forest . . . ."  *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 961–62 (9th Cir. 2002).  Specifically, 36 C.F.R. § 219.19 requires that "[f]ish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area."  Our law is clear that an agency must abide by its own regulations.  *See Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 852 (9th Cir. 2003); *see also United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266 (1954).

Here, the majority is so preoccupied with the issue whether "sustainability" is a discretionary term imposing no restraint on the Forest Service, that it fails to assess adequately whether the remaining population of the Alexander Archipelago wolf will be viable after the project proceeds.  A viable population is "one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well

distributed in the planning area." 36 C.F.R. § 219.19 (2000). There is a difference between a viable population and a sustainable population. The latter must contain a larger number of wolves because it is a population "capable of sustaining harvest." The Forest Service has recognized this distinction: "[M]inimum viable populations for many species may not satisfy the public need for wildlife populations depended upon to meet subsistence and/or sport hunting uses."

As quoted above, the language of the regulation states in pertinent part that a population of wildlife in the forest shall be maintained, so that is a "viable" population. It does not matter if the term sustainable population is hemmed in by the discretionary words "if possible." Instead, what is important is that there is a non-discretionary obligation in the Forest Plan for the Forest Service to maintain a "viable" population of the Alexander Archipelago wolf.[1]

Although the Forest Service concluded that the Forest Plan ensured the viability of the Alexander Archipelago wolf and also concluded that the Big Thorne Project was consistent with the Plan, the Forest Plan and the Big Thorne project do not demonstrate that it will manage old growth habitat in a manner that insures the viability of the wolf in well distributed populations throughout the Tongass National Forest. The agency is not obligated to provide a sustainable

---

[1] The majority argues that our precedent rejects the idea that the Forest Service needs to identify a "mechanism" to secure viability, and has rejected the idea that viability must be assessed in terms of population size, trends, or dynamics. But the problem here is not that the agency didn't use a particular "mechanism" to assess viability, the problem is rather that the agency just did not really grapple with assessing whether current wolf populations are viable. Nor does the majority.

wolf population, but it must ensure viable wolf populations consistent with its substantive obligation under 36 C.F.R. § 219.19. The Forest Plan presently provides no mechanism to ensure wolf population viability.

For another thing, the agency's rationale and reasoning process is too summary and conclusory, and fails to deal with the entire problem before it. When the agency opts to protect jobs rather than wolves, it would normally be allowed to make that choice. But the Supreme Court in *State Farm* elaborated on when we should consider an agency's action to be arbitrary and capricious. The Court stated that "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

That problem is presented here. The agency's assessment of the plight of the wolves in the Tongass National Forest is in my view inadequate.[2] In the mid 1990s, 250–350 wolves were thought to inhabit the Alexander Archipelago. The Big Thorne project area, located on the Prince of Wales Island, had sufficient habitat to support 45–50 wolves, making up three separate packs and a portion of a fourth pack. A project, funded primarily by the Forest Service, estimated that by fall 2012, only about 29 wolves and only two remaining

---

[2] The majority criticizes my specific discussion of the Prince of Wales Island, because it only covers less than 10% of the Tongass National Forest. I do so because the island includes unique, temperate old-growth rainforest habitat, and because deer populations depend on a sufficient quantity, distribution, and quality of winter old-growth habitat.

packs remained in the Big Thorne project area. By spring of 2013, researchers could only account for a mere six to seven wolves left in the project area. Another researcher observed that "numbers seem to indicate that the population of wolves in the central portion of Prince of Wales Island is approaching zero."

The Alexander Archipelago wolf and the Sitka black-tailed deer, as the Forest Service explained, are closely interrelated. Survival of the wolves depends on survival of the deer on which the wolves feed, which in turn depends on maintenance of the old growth forest habitat on which the deer depends. Deer populations depend on a sufficient quantity, distribution, and quality of winter old-growth habitat. It is inescapable that logging reduces this habitat. The Forest Service, aware that wolves depend on deer for their survival, and that those deer to survive depend on old growth forest habitat, has stressed that maintaining sufficient deer habitat capability, and thus greater number of deer, was "the most important factor" in sustaining wolf viability in the Tongass National Forest. In fact, the destruction of deer habitat capability is, as the agency has explained, "the most important factor limiting wolf viability." Yet the Forest Plan does not support deer habitat capability numbers, and nothing in the record supports the Forest Service's contention that viable wolf populations will remain relying on the other two prongs of habitat reserves and wolf mortality management.

Perhaps it cannot be said that the agency could never conclude on the limited evidence that a group of animals will or will not survive as a consequence of forest activities. But here the record is too sparse for definitive conclusion, and what evidence exists in the record shows drastically decreasing wolf population over the past decades and a

project that diminishes deer habitat capability, further threatening the wolves.

I would remand for more proceedings before the district court in which the Forest Service could better explain its reasoning and position relating to threatened habitat needed by the wolves that will be lost if the pending project is approved. I urge the majority to reassess its conclusions, remand for more development of the record and pertinent conclusions, and also give guidance (1) as to the interpretation of the term "viable" in its context; and also (2) on when and under what circumstances the agency would be free to modify its restrictive regulation on viable populations.

Hence I respectfully dissent in part. I would vacate the decision of the Forest Service and remand for its further proceedings, which at a minimum need to include both a thorough assessment of viability of the Alexander Archipelago wolf if the project proceeds, and an explanation of its reasoning sufficient to satisfy *State Farm*. Perhaps the agency can satisfactorily explain itself. But explain it must do for the decision to be procedurally correct. And who knows, perhaps in going through the rigorous explanation of whether the Alexander Archipelago wolf will continue to exist in viable numbers, the agency may learn more, which could lead it to take some different action more favorable to wolf and human communities. At a minimum, the agency, by explaining itself, will help to fully inform the public about the issues presented in balancing wolf survival, adequacy of deer habitat, and impact on jobs and pertinent communities caused by the final agency action.